DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, D.M., minor child, and Appellant, Donna M. ("Mother"), have each appealed from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated Mother's parental rights and placed D.M. in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 {¶ 2} Mother is the natural mother of two children, D.M., born November 25, 1998, and A.M., born January 1, 2004. Only D.M.'s custody is involved in this action. The alleged father of D.M., Charles Schmidt, was served by publication. He did not participate in the permanent custody hearing below and is not a party to this appeal.
 {¶ 3} CSB initially became involved with the family in July 2000 when Mother left D.M. at a relative's home for the second time with no food, diapers, or asthma medication. The child was placed in foster care. After six months, D.M. was returned to Mother under protective supervision for three additional months. The present case was initiated on January 27, 2003 after D.M. was taken into custody pursuant to Juv. R. 6. Mother allegedly indicated she could no longer take care of D.M., who presented significant behavioral and emotional problems. Mother had no income and was staying at a homeless shelter, where D.M. was behaving very aggressively.
 {¶ 4} The trial court adjudicated D.M. to be a dependent child and placed him in the temporary custody of CSB. A case plan, addressing Mother's history of homelessness, lack of income, possible mental illness, lack of parenting skills, and D.M.'s behavioral issues, was adopted by the court.
 {¶ 5} In December 2003, the trial court granted a six-month extension of temporary custody. In June 2004, a second six-month extension was granted, with the trial court noting that Mother and D.M. had each made progress, but neither was ready for reunification. Mother moved for legal custody, and her motion was held in abeyance.
 {¶ 6} On December 17, 2004, CSB moved for permanent custody. In response to a motion by Mother's attorney, the trial court found that a conflict might exist between the recommendations of the guardian ad litem and the wishes of the child. The trial court, therefore, appointed counsel for the child on January 20, 2005.
 {¶ 7} Following a hearing in April 2005, the trial court granted CSB's motion for permanent custody and denied Mother's outstanding motions. Trial counsel for Mother and for D.M. each filed a notice of appeal, but sought permission to withdraw from further representation. New attorneys were appointed for Mother and D.M. for purposes of appeal.
 {¶ 8} Appellate counsel for Mother assigns one error for review and Appellate counsel for D.M. assigns two errors for review. D.M.'s first assignment of error and Mother's sole assignment of error will be considered together because they are related.
MOTHER'S ASSIGNMENT OF ERROR
"The trial court erred in granting the Appellee's request for permanent custody because such a determination was contrary to the weight of the evidence and because insufficient evidence was presented by the Appellee to prove by clear and convincing evidence that it was in the child's best interest to terminate his relationship with his mother."
D.M.'S ASSIGNMENT OF ERROR I
"The juvenile court's decision to grant permanent custody to CSB is not supported by the manifest weight of the evidence."
 {¶ 9} In Mother's sole assignment of error and D.M's first assignment of error, Mother and D.M. each assert that the weight of the evidence fails to support the finding of the trial court that it was in the best interest of the child to be placed in the permanent custody of CSB.
 {¶ 10} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in criminal cases. Tewarson v.Simon (2001), 141 Ohio App.3d 103, 115.
"The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Alterations sic.) Id., citing State v.Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Moreover, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." Id.
 {¶ 11} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S.
(1996), 75 Ohio St.3d 95, 99.
 {¶ 12} The trial court found that the first prong of the permanent custody test was satisfied because D.M. had been in the temporary custody of CSB for more than 12 of the prior 22 months. Neither appellant contests that finding. The appellants challenge only the finding on the best interest prong of the permanent custody test.
 {¶ 13} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[1]
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith
(Jan. 2, 2002), 9th Dist. No. 20711, at 6; see, also, In rePalladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 14} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re Adoption of Holcomb
(1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
1. Interaction and interrelationship of the child
 {¶ 15} Mother's argument on appeal focuses on her purported compliance with the case plan because she claims it demonstrates "substantial improvement" in her ability to parent D.M. Mother reasons that her ability to parent was the main focus in the present case. While we agree that Mother's ability to parent D.M. is critical to this case, the proper question before the trial court, as well as this court on review, is more comprehensive. In order to determine the best interest of the child, Ohio law specifically requires consideration of all relevant factors, but specifically including the four statutory factors set forth above. See R.C. 2151.414(D). Mother's appellate brief fails, unfortunately, to address these four factors directly. We will consider the evidence regarding Mother's ability to parent D.M. where it is relevant to the best interest factors set forth in R.C. 2151.414(D).
 {¶ 16} The first best interest factor, the interaction and interrelationship of the child, is "highly significant," and "focuses on a critical component of the permanent custody test: whether there is a family relationship that should be preserved."In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at 9; In reC.M., 9th Dist. No. 21372, 2003-Ohio-5040, at ¶ 11. In the present case, paternity was never established by Charles Schmidt, and there is no evidence that he, or any other alleged father, had any contact with the child or CSB during the pendency of this case. There is some evidence of bonding by D.M. with his younger sister, A.M., as well as with Mother's current boyfriend. D.M.'s central relationship is with his Mother and that relationship was explored at length during the permanent custody hearing. There is no evidence of any other relationships with friends or relatives.
 {¶ 17} It is clear that D.M. has special needs and serious psychological issues. At the time D.M. was removed from the home, CSB caseworker, Karen Annis, indicated that he had a problem making attachments with people. He also exhibited angry outbursts, tantrums, manipulative behavior, cruelty to animals, and sexual behavior. The child was hyperactive, aggressive, and very difficult to control. He would hit, bite, kick, have tantrums that lasted 20-30 minutes, roll on the floor, try to hurt people and use profanity. He would run around on the tops of furniture and jump off. Annis testified that D.M. challenged every instruction he was given. Every activity with the child was an effort and took a great deal of time. D.M. required very intense and constant supervision.
 {¶ 18} D.M. was initially placed in foster care. He was referred to the Blick Clinic and placed in an Integrated Preschool Program for children with developmental delays. In November 2003, when in-home visits were begun, D.M. had an increase in soiling and wetting activity. He soiled in his pants, on the floor of his bedroom, and in the shower of the bathroom, and then he would play with the feces. At approximately that time, the foster mother determined that she could no longer take care of the child. D.M. was placed at Belmont Pines Psychiatric Hospital in Youngstown. After approximately 2 months, he was moved to the Applewood Center's Children's Aid Society ("CAS"), a residential treatment facility in Cleveland. In November 2004, in-home visits were reinstituted, but D.M.'s behavior again declined. Soiling and wetting incidents took place around the time of in-home visits.
 {¶ 19} Christina Distefano, a residential therapist who works with emotionally disturbed children at CAS, testified regarding D.M.'s treatment at the acility over the course of 15 months. The child was diagnosed with oppositional defiant disorder, attention deficit disorder, and reactive attachment disorder. He was said to possibly be bi-polar. Prescribed medications for D.M. included seroquel, to help with mood stabilization and aggressiveness; adderall, to control impulsivity; and clonodine, to help with restlessness. Distefano counseled D.M. individually, in group therapy, and in family counseling with Mother.
 {¶ 20} Distefano testified that D.M.'s stay at CAS presented D.M. with his first structured and consistent environment. According to the witness, both D.M. and Mother made significant improvements during this period. D.M. started to form attachments with adults and became more affectionate and trusting.
 {¶ 21} Based on the child's patterns of behavior, Distefano concluded that D.M. felt more secure in the institutional environment than at Mother's home. Distefano explained that she did not know, for certain, why the soiling episodes were occurring after in-home visits, though she said that it is not uncommon for children to react after a visit. She also stated that such behavior can be related to reactive attachment disorder. Distefano testified that she did not believe the soiling meant that D.M. wanted to go home, but rather could have been created by stress levels and provided the child with a type of control over himself. Over the course of treatment, D.M. improved his behavior in this regard.
 {¶ 22} Distefano emphasized that D.M.'s needs are significant and he continues to need counseling, therapy, and to have his medications medically monitored and properly administered. He will require a special school where there can be more one-on-one interaction than in a regular school. He requires 24-hour supervision. If D.M. is provoked, and is unsupervised, he may lash out, throw things, and strike others. In addition, Distefano affirmed that D.M.'s caregiver must be a good advocate for him.
 {¶ 23} Because of D.M.'s special needs, Mother's mental health and the quality of her parenting skills are of particular importance in this case. Following a mental health evaluation, Mother was diagnosed with a depressive disorder not otherwise specified. She participated intermittently in counseling at Portage Path Behavior Center from March 2004 until November 2004. Her counselor, Blaine Muehlbauer, testified that she was doing well, handling problems that arose, setting limits for her son, and meeting her treatment goals, but also testified that Mother was discharged for "not following through." CSB caseworker Annis interpreted Mother's progress with Muehlbauer as "minimal." CAS therapist Distefano worked with Mother and D.M. together in family counseling. Distefano recommended that Mother should seek individual counseling to address her own attachment issues and mental health issues from past trauma.
 {¶ 24} Mother presented the testimony of Mahzoor Elahi, a staff psychiatrist at Community Support Services. Dr. Elahi met with Mother four times between January 2005 and April 2005, and prescribed Zoloft for Mother's depression. Dr. Elahi indicated that Mother lacks a support system, social skills, and finances. The witness stated that Mother has been doing better with medication and is "relatively stable" in regard to her depression. Dr. Elahi said that he never observed Mother parent D.M., and could not specifically address Mother's child-rearing capacity.
 {¶ 25} As to Mother's parenting skills, evidence was presented that she completed a series of standard parenting classes and was referred to CAS for additional help with D.M.'s special needs. Initially, Mother did not understand D.M.'s developmental level and did not communicate well with him. CAS therapist Distefano provided joint counseling to Mother and D.M. for 15 months. She found that Mother genuinely cares about D.M. and has improved in terms of setting limits and communicating with her child. Distefano indicated that Mother follows directions when prompted, but also indicated that she cannot spontaneously implement parenting skills. She further testified that Mother lacks the structure and routine that this child needs. Distefano concluded that Mother does not currently have the skills needed to provide care for D.M.
 {¶ 26} Caseworker Annis testified similarly. She noted that the relationship between Mother and D.M. had strengthened over the course of counseling and that Mother had made some progress in parenting skills. However, like Distefano, Annis felt that Mother does not always remember to apply the skills she has been taught. Annis also observed that there still was not a trusting relationship between Mother and child, and Mother was not able to comfort D.M. when he was frightened.
 {¶ 27} In addition, Annis felt that Mother's situation remains unstable. According to the caseworker, while Mother has maintained housing since November 2003, she is dependent on her current paramour for additional expenses. Annis did not believe that Mother could meet her own needs, let alone D.M.'s special needs. D.M. requires intensive supervision and Annis did not believe that Mother was able to provide the type of care and supervision that he requires. Annis felt that if Mother had custody of D.M., the child would be at risk to harm himself or his younger sister, A.M. She cited the fact that D.M. broke the nose of a foster sister.
 {¶ 28} Annis also noted several concerns regarding Mother's parenting of D.M.'s sibling, A.M., who remained in the home. Annis indicated that Mother was behind in obtaining the child's vaccinations, had delayed in seeking medical help for her, had not administered antibiotic medication to A.M. on a regular basis, and had taken the child out in cold weather without shoes or socks. The trial court reasonably observed that Mother's failure to appropriately obtain and dispense medication to A.M. "calls into question her ability to handle the complex medical regimen [D.M.] will have."
 {¶ 29} Jean Heineman, a CSB visitation aide, also testified regarding Mother's parenting skills. She supervised 15-18 in-home visits since November 19, 2004. Heineman noted some improvement and believed that the visits were positive for D.M. She stated that visits have been better in the last month or so, with most of the improvement coming after the motion for permanent custody was filed. Heineman testified that D.M. is beginning to demonstrate more of an attachment to Mother. The witness testified that D.M. still did not have a great deal of trust in Mother, however, because she had not always been truthful with him. Heineman also testified that Mother has learned to set limits "by rote," according to what she learned through therapy at CAS. The witness expressed concern regarding Mother's failure to properly handle medications for herself and for A.M.
 {¶ 30} Heineman commented upon the presence of "drain flies" in the home, and testified that Mother's home is "marginally clean." She added that Mother's hygiene is problematic with very strong body odor, and A.M. was not kept very clean either. She noted that the baby consistently had a diaper rash, and she had to repeatedly ask Mother to wash the baby's diaper area when she changed a diaper.
 {¶ 31} For her part, Mother presented the testimony of Alicia Crews, a service coordinator with Help Me Grow. Crews visited the home weekly, and later bi-weekly, to help with Mother's parenting of A.M. Crews stated that she believed Mother understood the stages of development and displayed interaction appropriately. Crews was never concerned about the cleanliness of A.M. or of the house, thus disagreeing with the assessment of CSB aide Heineman. Crews testified that Mother positioned A.M. safely, gave her proper instructions, praised the child, and adequately parented her. As to Mother's parenting of D.M., she found nothing inappropriate. Crews stated that Mother was able to give directions to D.M. and the child was able to respond.
 {¶ 32} On cross-examination by CSB, Crews conceded that she did not often check the baby for diaper rash or check whether medications were regularly dispensed. Through further cross-examination by the guardian ad litem, Crews admitted that she was not fully aware of D.M.'s problems, and was not familiar with the complete CSB case plan. In addition, Crews testified that she only deals with children up to the age of three and that her focus in this case was A.M. She stated that she had only been in the house once or twice when D.M. was present. Considering that Crews's focus was on the infant child A.M., and given Crews's very limited exposure to D.M. and Mother's case plan, little credence can be accorded to this witness's opinion regarding Mother's ability to parent D.M.
 {¶ 33} In weighing the evidence on the first best interest factor, this Court recognizes that there was progress by Mother and child, and that there are some conflicts within the testimony. However, it is significant that this case has gone on for more than two years and Mother had the benefit of two six-month extensions. The caseworker, the guardian ad litem, and the residential therapist — the three service providers who spent the most time with Mother and D.M. — all shared the view that Mother is not capable of independently utilizing proper parenting techniques and meeting the extraordinary needs of D.M. We note that the positive opinion of witness Crews regarding Mother's ability to parent D.M. was markedly diminished upon cross-examination. Further, while Dr. Elahi opined that Mother was relatively stable, he also observed that she lacked a support system, social skills, and finances. He specifically stated that he was unable to evaluate Mother's ability to parent. Overall, the evidence on this factor supports the conclusion of the trial court that Mother has not demonstrated an ability to meet the special needs of D.M., and weighs in favor of termination.
2. Wishes of the child.
 {¶ 34} R.C. 2151.414(D)(2) provides that the trial court shall consider the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child.
 {¶ 35} In the present case, this six-year-old child with serious psychological problems did not address the trial judge directly. Deborah Carter, the guardian ad litem for D.M., expressed the view that the best interest of the child was to be placed in the permanent custody of CSB. In so concluding, she relied on her belief that D.M. needs stability and clearly defined boundaries where he can learn to love and trust. Despite some progress by Mother through her participation in 15 months of weekly family therapy sessions, Carter does not think that Mother has the decision-making ability or stability to address the behavioral needs of D.M.
 {¶ 36} Caseworker Karen Annis and therapist Christina Distefano each testified that D.M. told them he wished to go home to live with his mother. Annis testified that the child became upset when Mother failed to visit. Distefano testified similarly that D.M. looks forward to visits with Mother and misses her when the visitation day is changed. On September 26, 2004, Distefano's records indicated that the child often asked about his mother, and that he showed a "strong desire" to be with her and rejoin the family. Distefano stated that D.M. expressed that desire regularly.
 {¶ 37} Nevertheless, Annis and Distefano both also concluded that D.M. should not be returned to his Mother. Annis testified that although D.M. and Mother have both made progress, D.M. is a very difficult child and Mother is unable to meet his special needs. Distefano, too, noted a significant improvement in both D.M. and Mother over the course of the 15 months that the child had been in residential treatment at CAS. Distefano even acknowledged that the termination of parental rights would have a detrimental effect on D.M., in that he would wonder why Mother was no longer visiting him. Still, she concluded that Mother does not have the skills needed to take care of D.M.
 {¶ 38} The evidence on this factor weighs in favor of termination.
3. The custodial history of the child
 {¶ 39} The third best interest factor requires consideration of the custodial history of the child. The child was placed in the temporary custody of CSB for six months at the age of eighteen months. He was removed from the home again at the age of four years. The child has now been in the custody of CSB since January 2003. During this time, D.M. was in foster care for approximately ten months, was hospitalized at Belmont Pines for two months, and was in residential treatment at CAS for 15 months. The child has been in the custody of CSB for much of his life.
4. The child's need for a legally secure permanent placement
 {¶ 40} As to the fourth best interest factor, there was ample evidence before the trial court that D.M. was in need of a legally secure permanent placement.
 {¶ 41} On appeal, D.M.'s attorney argues that the trial court erred in failing to place the child in a planned permanent living arrangement ("PPLA"). He contends that the witnesses who testified that PPLA is not a stable and permanent home did not consider the possibility that adoptions might fail. Counsel also complains that there was no testimony as to the adoptability of D.M.
 {¶ 42} We cannot speculate as to what a witness might have considered before reaching a conclusion. This Court is obligated to consider, instead, what evidence exists in the record and whether the weight of that evidence supports the judgment of the trial court. Certainly, any relationship in life may change or fail for a variety of reasons. However, a well-considered adoption will generally provide a stable, permanent home for a child. The CSB caseworker testified that consideration was given to the possibility of requesting PPLA as a disposition, but did not think it appropriate because of the child's reactive attachment disorder. Rather, she testified that it was preferable that D.M. should have a permanent home where he could form strong attachments to help him resolve his reactive detachment disorder. She also indicated that it would be difficult to locate a therapeutic foster family that could make a long-term commitment to D.M. Morevoer, the statutory best interest factors, as amended in 1996, no longer require consideration of the reasonable probability of adoption. See R.C. 2151.414(D).
 {¶ 43} There were no suitable friends or relatives willing to provide for D.M.'s care. The maternal grandmother had a long history with CSB, a maternal aunt had lost permanent custody of her own child, a maternal great aunt withdrew herself from consideration, and the alleged father had not established paternity. In addition, the alleged father's whereabouts were unknown and nothing was known about the members of his family.
 {¶ 44} Therapist Distefano acknowledged that if Mother's parental rights to D.M. were terminated, D.M. would wonder why Mother was no longer visiting him. However, Distefano also stated that D.M. continues to require residential treatment and Mother is not able to meet his needs.
 {¶ 45} Caseworker Annis believes the best interest of the child is to be placed in the permanent custody of CSB. She stated that D.M. has made progress, but he is still very difficult to parent and Mother is unable to meet his needs.
 {¶ 46} Deborah Carter, the guardian ad litem, also stated that she believed the best interest of the child was to be placed in the permanent custody of CSB. Carter believed the child should remain at CAS until a suitable foster home could be found. Carter explained that, in her view, D.M. needs stability and clearly defined boundaries with consistent consequences for actions. She did not believe that D.M. had had a stable living environment with Mother. She testified that D.M. deserves stability and a family that can offer constructive boundaries. According to Carter, Mother has not demonstrated sound decision-making or the stability necessary to address the behavioral needs of D.M.
 {¶ 47} D.M. has been in care for more than two years. During that time, Mother failed to learn to implement the skills necessary to effectively parent the child. The trial court concluded: "While [D.M.] may have some difficulty when the relationship with his Mother is severed, this hardship is far outweighed by the benefits he will receive in a stable, structured and loving home."
 {¶ 48} Upon review, the record demonstrates that there was ample evidence before the trial court from which it could conclude that permanent custody was in the child's best interests. The record does not support a conclusion that the trial court clearly lost its way and created a manifest miscarriage of justice. Mother's sole assignment of error and D.M.'s first assignment of error are overruled.
 D.M.'S ASSIGNMENT OF ERROR II
"[D.M.'s] trial counsel was ineffective and incompetent."
 {¶ 49} D.M.'s appellate counsel asserts that D.M.'s trial counsel provided ineffective assistance of counsel.
 {¶ 50} In order to establish a claim of ineffective assistance of counsel, Appellant must establish that: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defense. State v. Kole (2001), 92 Ohio St.3d 303, 306. To show that a party has been prejudiced by counsel's deficient performance, Appellant must prove that there is a reasonable probability that, were it not for the counsel's unprofessional errors, the outcome of the trial would have been different.State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Stricklandv. Washington (1984), 466 U.S. 668, 694, 80 L.Ed.2d 674. Appellant bears the burden of proof on the issue of counsel's ineffectiveness, since in Ohio a properly licensed attorney is presumably competent. State v. Calhoun (1999),86 Ohio St.3d 279, 289. Moreover, Appellant must overcome a strong presumption that the challenged action constitutes trial strategy. State v.Carter (1995), 72 Ohio St.3d 545, 558.
 {¶ 51} As examples of ineffective assistance of counsel, D.M.'s appellate counsel points to trial counsel having failed to: (1) object to several examples of hearsay evidence; (2) request an in camera interview for D.M.; (3) cross-examine the guardian ad litem; and (4) request PPLA as a dispositional placement.
 {¶ 52} We first consider trial counsel's failure to object to six instances of alleged hearsay. The statements which Appellant D.M. finds objectionable include three statements by the CSB caseworker: (1) that an AMHA agent asserted Mother might not be able to maintain her housing if her boyfriend continued living with her; (2) a medical doctor's opinion that the reason for D.M.'s soiling problem was not physical; and (3) a psychiatrist's opinion that D.M. would be harmed by a temporary placement. The examples also include a statement by a counselor that the guardian ad litem said Mother indicated a particular appointment had been cancelled and statements by a counselor and a therapist regarding their conversations as to Mother's insight, recall of events, decision-making, and coping skills.
 {¶ 53} The rules of evidence apply to all hearings on motions for permanent custody. Juv. R. 34(I). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay statements are generally inadmissible. Evid.R. 802.
 {¶ 54} Appellant D.M. has failed, we conclude, to establish that the lack of objection to these statements constitutes a claim of ineffective assistance of counsel. Appellant D.M. has not suggested or demonstrated that any of the statements were offered for the truth of the matter asserted. Additionally, several of these statements were admitted over the objection of Mother, whose position was generally aligned with the position of D.M. Furthermore, Appellant D.M. has not rebutted the strong presumption that the lack of objection by D.M.'s trial counsel might have been a matter of tactics.
 {¶ 55} In addition, Appellant D.M. has not demonstrated prejudice to D.M. by showing that, but for the lack of objection by D.M.'s trial counsel, the outcome of the trial would have been different. In fact, Appellant D.M. makes no argument as to prejudice in his appellate brief. We have only the bare assertion by Appellant D.M. that "inadmissible hearsay was presented to the trial judge." In considering the question of prejudice, we note that the case was tried to a judge. "Where a judge acts as the fact finder, it is presumed that the judge is capable of disregarding improper testimony." In re Sherman, 3rd Dist. Nos. 05-04-47, 05-04-48, 05-04-49, 05-04-50, 2005-Ohio-5888, at ¶ 15. Thus, unless it appears that the trial court actually relied on improper testimony in reaching its judgment, a reviewing court should be reluctant to overrule a permanent custody determination on this basis. Id. Appellant D.M. has not suggested, and it does not appear to this Court, that the decision of the trial court relies upon any of the cited statements in concluding that permanent custody is in the best interest of this child. As explained above, the record provides ample evidence from other sources which support the conclusion of the trial court. Thus, this Court does not conclude that the failure to object to these statements constitutes ineffective assistance of counsel.
 {¶ 56} D.M.'s appellate counsel next argues that trial counsel was ineffective when she failed to request an in camera interview of the child regarding her wishes as to custody. The record reveals that Mother's trial counsel moved for an in camera interview of the child prior to the hearing below, and that Mother's trial counsel subsequently withdrew that request without explanation. There is a strong presumption that such a decision was tactical. Given the similarity of interests between Mother and D.M. in this regard, as well as consideration of the fact that this child was only six-years old and had severe psychological problems, the failure of D.M.'s trial counsel to request an in camera interview carries the same strong presumption that the decision was a matter of trial strategy.
 {¶ 57} In addition, we observe that D.M.'s appellate counsel admitted that there was "abundant" evidence in the record that D.M. wished to return to Mother's home. Indeed, in its decision, the trial court specifically found that D.M. expressed a desire to live with Mother. There is, therefore, no demonstration of prejudice in trial counsel's failure to request an in camera interview. Given the presumption that such a decision was tactical, and the trial court's finding that D.M. wanted to live with Mother notwithstanding the lack of an in camera interview, we do not find the failure of trial counsel to request such an interview to represent ineffective assistance of counsel.
 {¶ 58} Third, D.M.'s appellate counsel contends that trial counsel's failure to cross-examine the guardian ad litem constituted ineffective assistance of counsel. Absent such questioning, appellate counsel argues that the trial court had no evidence of the guardian ad litem's opinion as to PPLA, and no "live testimony" regarding how the guardian ad litem arrived at her opinion.
 {¶ 59} Our review of the record reveals that the guardian ad litem presented not only an oral report during the permanent custody hearing, but also an 18-page written report. In her report, the guardian ad litem summarized more than 400 contacts with Mother, child, and various service providers conducted over the 27 months of this proceeding. The written report reviews D.M.'s placements in a foster home, a psychiatric hospital, a residential treatment facility, and explains the guardian ad litem's belief that D.M. should soon be placed in a therapeutic foster-to-adopt home. Ultimately, the guardian ad litem concluded that Mother cannot provide D.M. with the safe, secure, and stable family life that he desperately needs and deserves. In considering the best interest of the child, she recommended that D.M. should be placed in the permanent custody of CSB.
 {¶ 60} The guardian ad litem's recommendation specifically indicates a goal of adoption. In light of this recommendation, therefore, it may be presumed that the guardian ad litem has rejected other possible dispositions, including PPLA. A review of the report, made available to the trial judge and the parties prior to the hearing, makes the reasons for the opinion of the guardian ad litem clear.
 {¶ 61} Appellant D.M. has not overcome the presumption of competence of trial counsel or the presumption that the decision not to cross-examine the witness was a tactical one. In addition, given that the guardian ad litem expressed the same opinion in open court that she had expressed in her previously filed written report, Appellant D.M. has not shown that the failure to cross-examine the guardian ad litem prejudiced the child, such that there is a reasonable probability that the outcome of the trial would have been different.
 {¶ 62} Fourth, D.M.'s appellate counsel argues that D.M.'s trial counsel was ineffective due to a failure to request a disposition of PPLA. The transcript of the hearing reveals that Mother's counsel requested consideration of PPLA. The decision of the trial court reflects consideration and rejection of PPLA as a dispositional placement for the child, specifically noting that R.C. 2151.415(C)(1)(a) was not appropriate in this case. There is no reason to believe that the trial court's conclusion would have changed with an additional request for PPLA by D.M.'s counsel. The record, therefore, fails to demonstrate that the outcome of the proceeding would have been different.
 {¶ 63} Accordingly, Appellant D.M.'s second assignment of error is overruled.
 {¶ 64} Mother's sole assignment of error is overruled. D.M.'s two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Whitmore, J. Moore, J. CONCUR.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.