OPINION
{¶ 1} Appellants Kerri Kessinger and Kendavid Kessinger, Sr. ("Appellants")[1] appeal from the May 25, 2007 Judgment Entry of the Court of Common Pleas of Defiance County, Juvenile Division, terminating their parental rights and granting permanent custody of Cheyenne Kessinger (D.O.B. 2/13/02) and Kendavid Kessinger, Jr. (D.O.B. 12/17/03) to the Defiance County Department of Job and Family Services ("DCJFS").
 {¶ 2} On May 26, 2005 the Defiance Police Department notified the *Page 3 
DCJFS that Cheyenne had been found unsupervised and walking several blocks away from her home near a busy roadway. The DCJFS initiated an investigation and determined that the Kessingers had previously been involved with DCJFS as well as with similar agencies in Williams and Fulton Counties. On May 26, 2005 the DCJFS filed a motion for emergency custody with the Defiance County Juvenile Court. After conducting a hearing, the juvenile court granted said motion, removed Cheyenne and Kendavid Jr. from Appellants' custody, and placed the children in the emergency custody of the DCJFS pending adjudication of a complaint to be filed by the DCJFS. Additionally, a Guardian Ad Litem ("GAL") was appointed to represent the interests of the children. (See May 27, 2005 Ex Parte Removal Order and June 2, 2005 Judgment Entry).
 {¶ 3} On June 2, 2005 the DCJFS filed a complaint alleging that Cheyenne and Kendavid, Jr. were neglected as defined in Ohio Revised Code Section 2151.03 and that Kendavid Jr. was dependent as defined in Ohio Revised Code Section 2151.04 based upon allegations of lack of supervision by Appellants, inadequate parental care, and a dirty home. The complaint also requested that the children be placed in the temporary custody of the DCJFS.[2] *Page 4 
 {¶ 4} On July 6, 2005 the juvenile court conducted a pre-trial hearing on the DCJFS's complaint. Appellants entered an admission to the allegation of dependency and the DCJFS moved to dismiss the allegations of neglect. The court dismissed the allegations of neglect and found Cheyenne and Kendavid Jr. to be dependent children as defined in R.C.2151.04. Appellants then waived their right to a second hearing in this matter and elected to proceed with disposition. All parties stipulated and agreed that it was in the best interests of Cheyenne and Kendavid Jr. to remain in the temporary custody of the DCJFS. Accordingly, the court ordered that Cheyenne and Kendavid Jr. be placed in the temporary custody of the DCJFS for one year unless terminated sooner, but that Appellants have visitation with the children. (See July 22, 2005 Judgment Entry).
 {¶ 5} On August 15, 2005 the DCJFS filed a case plan with the goal of reunification. This case plan called for Appellants to maintain a clean and safe environment for the children, attend parenting and life-skills classes, attend counseling sessions and obtain psychological evaluations.[3] On January 18, 2006 the DCJFS filed an amended case plan. This case plan changed the children's placement due to the present foster mother's illness and suspended Appellants' visits with Cheyenne and Kendavid Jr. until further notice based upon a *Page 5 
recommendation by Cheyenne's psychiatrist that her behavior was out of control and worsened after visits with her parents. Appellants did not file an objection in response to the changes in the case plan.
 {¶ 6} On March 9, 2006 the juvenile court conducted a hearing on Appellants' oral motion for visitation with Cheyenne and Kendavid, Jr. The juvenile court found that it was in the best interests of Kendavid Jr. that supervised visits with Appellants be reinstated. However, the court found that it was not in the best interests of Cheyenne to have visits with her parents and ordered that Appellants were not to have visitation with Cheyenne until further order of the court.[4] (See March 24, 2005 Judgment Entry).
 {¶ 7} On May 18, 2006 the DCJFS filed another amended case plan which outlined specific goals for Appellants to accomplish in order to successfully complete the case plan. On May 22, 2006 the DCJFS filed a motion to extend temporary custody of Cheyenne and Kendavid Jr. pursuant to R.C. 2151.353. In its motion the DCJFS requested that the temporary custody of Cheyenne and Kendavid Jr. be extended for an additional six months as the case plan had not *Page 6 
been completed and more time was needed to determine whether the children could safely be returned to Appellants' custody.
 {¶ 8} On May 23, 2006 the trial court conducted a hearing on the DCJFS's motion to extend custody wherein the parties stipulated that the DCJFS's temporary custody of Cheyenne and Kendavid Jr. continue for an additional six months. In its May 26, 2006 Judgment Entry the juvenile court approved the May 18, 2006 case plan, ordered that Cheyenne and Kendavid Jr. remain in the temporary custody of the DCJFS for an additional six months, and ordered that the previous orders regarding visitation and support remain in full force and effect.
 {¶ 9} On December 29, 2006 the DCJFS filed a motion for permanent custody of Cheyenne and Kendavid Jr. pursuant to R.C. 2151.414.[5] In support of its motion for permanent custody, the DCJFS filed an affidavit of Phyllis Johnson, the DCJFS social worker assigned to Cheyenne and Kendavid Jr.'s cases.[6] On March 22, 2007 the children's GAL filed a report and recommendation wherein *Page 7 
she recommended that it would be in the best interests of Cheyenne and Kendavid Jr. to be placed in the permanent custody of the DCJFS.
 {¶ 10} The juvenile court conducted a hearing on the DCJFS's motion for permanent custody on April 3, 2007 through April 5, 2007. On April 30, 2007 the juvenile court conducted a hearing to issue its decision on the motion for permanent custody. On May 25, 2007 the juvenile court issued a Judgment Entry terminating Appellants' parental rights to Cheyenne and Kendavid Jr. and awarding permanent custody of Cheyenne and Kendavid Jr. to the DCJFS.
 {¶ 11} Appellants now appeal, asserting one assignment of error.
 ASSIGNMENT OF ERROR THE TRIAL COURT'S DETERMINATION THAT IT WAS IN THE BEST INTERESTS OF CHEYENNE KESSINGER AND KENDAVID KESSINGER, JR., FOR PERMANENT CUSTODY TO BE GRANTED TO THE DEFIANCE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 12} Prior to addressing Appellants' assignment of error, we must first address the nature of this appeal. Our review of a grant of permanent custody begins by noting that "[i]t is well recognized that the right to raise a child is an `essential' and `basic' civil right.In re Franklin, 3rd Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841 citingIn re Hayes (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." In re Hayes, supra, quotingIn re Smith (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. *Page 8 
 {¶ 13} Additionally, the trial court is vested with broad discretion in determining the allocation of parental rights and responsibilities for the care of minor children. Blacker v. Wilhelm, 6th Dist. No. WD-04-003, 2005-Ohio-317 citing Miller v. Miller (1983),37 Ohio St.3d 71, 74, 523 N.E.2d 846. As a trial court is in the best position to weigh witness credibility and evaluate a child's needs, the standard for reviewing a trial court's grant of permanent custody is abuse of discretion. In re Rinaldi, 3rd Dist. No. 1-02-74, 2003-Ohio-2562. Therefore, absent an abuse of that discretion, a trial court's decision regarding the allocation of parental rights and responsibilities must be upheld. Masters v. Masters (1994), 69 Ohio St.3d 83, 85, 630 N.E.2d 665. An abuse of discretion constitutes more than an error of law or judgment and implies that the trial court acted unreasonably, arbitrarily, or unconscionably. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id. Therefore, it is within these constructs that we must examine Appellants' assignment of error.
 {¶ 14} In their sole assignment of error, Appellants allege that the trial court's grant of permanent custody to the DCJFS is against the manifest weight of the evidence.
 {¶ 15} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court proceeding, the standard of review is the same *Page 9 
as that in criminal cases. In re DM. 9th Dist. Nos. 22732 and 22749,2005-Ohio-6740 citing Tewarson v. Simon (2001), 141 Ohio App.3d 103,115, 750 N.E.2d 176. In reviewing whether the trial court judgment was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In doing so, the reviewing court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the find of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387; see also State v.Andrews 3rd Dist. No. 1-05-70, 2006-Ohio-3764; State v. Martin (1983),20 Ohio App.3d 172, 485 N.E.2d 717.
 {¶ 16} In making this determination, the Supreme Court of Ohio has outlined eight factors for consideration, which include "whether the evidence was uncontradicted, whether a witness was impeached, what was not proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness's testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary."State v. Apanovitch (1987), 33 Ohio St.3d 19, 23-24, 514 N.E.2d 394
citing State v. Mattison (1985), 23 Ohio App.3d 10, 490 N.E.2d 926. *Page 10 
 {¶ 17} Before a juvenile court may terminate parental rights and award permanent custody of a child to a properly moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). In re DM., 2005-Ohio-6740
at ¶ 11 citing R.C. 2151.414(B)(1)(a) through (d) and (2); See alsoIn re William S. (1996), 75 Ohio St.3d 95, 99, 661 N.E.2d 739.
 {¶ 18} In analyzing the first prong of the permanent custody test, we note that the trial court must first determine, by clear and convincing evidence, whether any of the subsections of R.C. 2151.414(B)(1) have been met. In the present case, the evidence demonstrated that Cheyenne and Kendavid Jr. were not abandoned or orphaned. See R.C.2151.414(B)(1)(b) and (c). However, it was undisputed by Appellants that Cheyenne and Kendavid Jr. had been in the temporary custody of the DCJFS for at least 12 months of a consecutive 22-month period prior to the *Page 11 
DCJFS filing its motion for permanent custody.[7] See R.C.2151.414(B)(1)(d). Therefore, we find that the record contains clear and convincing evidence so as to satisfy the first prong of the permanent custody test.
 {¶ 19} Turning our attention to the second prong of the permanent custody test, the "best interest of the child" standard, we note that "[t]he best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact `a firm belief or conviction as to the facts sought to be established.'" In re A.B. 9th Dist. No. 22437, 2005-Ohio-1273 at ¶ 9; see also In re Adoption ofHolcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St.469 at paragraph three of the syllabus. An appellate court will not reverse a trial court's decision on parental rights and custody unless it finds that the decision is unsupported by "sufficient evidence to meet the clear and convincing standard of proof." In re Dylan C.
(1997), 121 Ohio App.3d 115, 121, 699 N.E.2d 107.
 {¶ 20} R.C. 2151.414(D) provides, in relevant part, as follows: *Page 12 
 (D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; * * *
 {¶ 21} At the permanent custody hearing, the DCJFS presented extensive testimony addressing the factors contained in R.C. 2151.414(D).
 {¶ 22} The DCJFS presented the testimony of Sabrina Shull, the children's current foster mother. Shull testified that when the children first came to her home in January 2006, they were not having any contact with Appellants. Shull also testified that initially there were a lot of problems with the children and that Cheyenne in particular would throw screaming fits, but after awhile the children calmed down. However, Shull testified that when Kendavid Jr. resumed visitation with Appellants in March of 2006, there was an escalation in his anger and aggressive behavior. Specifically, Shull testified that things would be really bad *Page 13 
for a few days after his visits and then he would calm down for awhile. Shull also testified that for several months she had trouble getting Kendavid Jr. to his visits with Appellants and that he'd be upset and would often start screaming at her to stop the car. She also testified that his toilet-training "took a backslide" when the visitation resumed, but admitted that visitation had been better in the last month or so. Shull testified that having Cheyenne and Kendavid Jr. home has been challenging but that she loves them and would be willing to adopt them should they become available for adoption.
 {¶ 23} Sabrina Shull's mother, Sharon Shull, also testified regarding Cheyenne and Kendavid Jr.'s behavior in their home.[8] She testified that Cheyenne initially had a terrible temper but has since gotten it under control at home, though not as well at school. She also testified that Kendavid Jr. was "the sweetest little boy you've ever seen" until he started visitation with Appellants and then he got angry. Specifically, Sharon testified that Kendavid Jr. would be angry when he'd return from visitation, that he'd have nightmares and would wake up screaming, and that he would kick, hit, and bite Cheyenne after returning from visitations. Sharon also testified that she witnessed Kendavid Jr. bite his mother during a visitation session but that there was no reaction or appropriate response from his mother. *Page 14 
 {¶ 24} The DCJFS also presented the testimony of Tammy McNeil, a transportation coordinator for the agency who also oversees visitation sessions. McNeil testified that she observed approximately 52 visits between Kendavid Jr. and Appellants, and that based upon her observations she felt that there was a lot of strain between Kendavid Jr. and his mother. Specifically, McNeil testified that when Kendavid Jr. is visiting with just his mother, he doesn't want any contact with her and has to be coaxed into the visitation room. Additionally, McNeil testified that when his mother tries to hold him, he will kick, hit her or pull her hair, and that he has even bitten her on occasion. McNeil testified that when Kendavid Jr. behaves like this, his mother does not react and she does not discipline him. However, McNeil testified that the visits are usually better when the father is also present. McNeil also testified that it appears as if Appellants have no boundaries in terms of discipline with Kendavid Jr. Additionally, McNeil testified that Appellants would rarely ask about Cheyenne, nor did they ask her when they would be able to resume visitation with Cheyenne.
 {¶ 25} Specifically regarding Cheyenne, the DCJFS presented the testimony of Susan Shirey, Cheyenne's pre-school teacher. Shirey testified that Cheyenne has behavior and emotional issues and that it is essential that Cheyenne have boundaries and rules. Shirey testified that Cheyenne's behavior has improved since the start of the school year, but testified that she believed that if *Page 15 
Cheyenne were in an unstructured environment, she would not continue to improve.
 {¶ 26} The DCJFS also presented the testimony of Lucy Moreno, a therapist with Harbor Behavioral Healthcare who worked with Cheyenne on a biweekly basis, addressing her aggressive and sexual behavior issues. Moreno testified that in April of 2006 she spoke with the children's GAL and voiced her concern that Cheyenne may regress if the visitations with her parents resumed. Dr. Mashalker of Harbor Behavioral Healthcare also testified regarding his treatment of Cheyenne. Mashalker testified that Cheyenne had been diagnosed with post traumatic stress disorder and showed symptoms of a reactive attachment disorder.[9] He testified that Cheyenne needs consistency, boundaries, discipline, and academic enrichment and will continue to need counseling and therapy for at least a few years. Mashalker also testified that in Cheyenne was emotionally fragile and that changes would be detrimental to her progress.
 {¶ 27} Although the children's GAL did not testify at the permanent custody hearing, she was present at the hearing and engaged in cross-examination of many of the witnesses presented. Prior to the permanent custody hearing, the GAL filed a report and recommendation concerning Cheyenne and Kendavid Jr. *Page 16 
wherein she noted her concern with the family's prior involvement in Williams and Fulton counties and stated "it appears as if when the family begins to have problems that they move from county to county." The GAL also stated her concern with the fact that Appellants have not seen Cheyenne since November of 2005 and was not aware of any motions being filed by Appellants requesting to obtain visitation with her. Additionally, the GAL stated that she did not believe Appellants could handle any additional children, especially a child with special needs such as Cheyenne. Further, she noted that both Cheyenne and Kendavid Jr. have excelled tremendously in foster care, that Cheyenne's behavior has improved significantly since she has been in her present foster home, and that the foster mother handles the children very well and is capable and willing to adopt the children. Based on these reasons, the GAL recommended that it was in the best interests of the children that the DCJFS be granted permanent custody.
 {¶ 28} After considering the testimony and evidence presented at the April 3-5, 2007 permanent custody hearing, the GAL's written report and recommendation, and the parties' written arguments, and having reviewed the history of the case, on April 30, 2007 the juvenile court conducted a hearing on its decision regarding permanent custody of Cheyenne and Kendavid, Jr. At this hearing the court stated, in relevant part, as follows:
 In addition to this situation, the testimony showed a very long family history with the Department of Job and Family Services *Page 17 of Williams, Fulton, and Defiance counties concerning this family.
 * * *
 The foster parents of these two minor children . . . Cheyenne and Kendavid [Jr.], have reported that upon the receipt of these children when they were placed, they were dirty, lacked manners, lacked all behavior control to, in fact were described as wild children. All of this demonstrates a lack of supervision by the adults or a lack of will to supervise or a lack of commitment to supervise . . . the State has proved by a level of clear and convincing [evidence] that altogether the picture is one of a family unable or unwilling to function sufficiently to raise these two small children in any safe or satisfactory way. The best interests of these two children, Cheyenne and Kendavid Jr. require that the prayer for permanent custody be granted.
 * * *
 I have no faith based upon the past five years worth of history that that will continue . . . the evidence clearly shows a history of dramatic ups and downs with this family and I suspect that will happen again.
 {¶ 29} In its May 25, 2007 Judgment Entry the juvenile court concluded, in relevant part, as follows:
 From the testimony adduced at the hearing, the Court finds by clear and convincing evidence as to Cheyenne and Kendavid Kessinger, Jr.,
 * * *
 It is in their best interests to be placed in the permanent custody of the Agency for eventual adoption.
 * * *
 The Court finds that Cheyenne and Kendavid Kessinger, Jr. have been in the custody of the Agency for 12 of the last 22 months and furthermore, that they cannot and should not be placed in the custody of their parents based upon the history of child endangering by the mother and continued neglect of these children . . . and their parents have demonstrated their inability to handle more than they already have. *Page 18 
 Based upon the testimony presented at the hearing and, having considered the reasonable probability of the children's eventual adoption if they were to be placed in the permanent custody of the Agency, and, having considered all of the statutory factors in Ohio Revised Code Section 2151.414(D) and the report of the Guardian Ad Litem, the Court finds that it is in the best interests of Cheyenne and Kendavid Kessinger, Jr. that they be placed in the permanent custody of the Agency and that no reasonable efforts on behalf of the Agency could prevent the continued removal of the children from their parents.
 The Court finds that though there has been some recent improvement in the family's stability, the Court has no faith that any of these improvements will continue due to the dramatic ups and downs that this family has gone through for many years as they have shown that they are unable to provide a consistent, permanent, stable home for their children for any substantial length of time.
 {¶ 30} Based on the foregoing, we find that the record is replete with clear and convincing evidence to support the trial court's finding that the grant of permanent custody of Cheyenne and Kendavid Jr. to the DCJFS would be in the best interests of the children based upon an analysis of the factors contained in R.C. 2151.414(D) so as to satisfy the second prong of the permanent custody test.
 {¶ 31} Thus, we find that the trial court carefully considered all of the evidence presented and engaged in a thorough analysis of both prongs of the permanent custody test as set forth in R.C. 2151.414. Additionally, based on our review of the record, we cannot say that the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Accordingly, we find that the trial court's termination of *Page 19 
Appellants' parental rights and grant of permanent custody of Cheyenne and Kendavid Jr. to the DCJFS was not against the manifest weight of the evidence. Appellants' sole assignment of error is overruled.
 {¶ 32} Therefore, the May 25, 2007 Judgment Entry of the Court of Common Pleas of Defiance County, Juvenile Division, terminating Kerrie and Kendavid Kessinger Sr.'s parental rights and granting permanent custody of Cheyenne and Kendavid Kessinger, Jr. to the Defiance County Department of Job and Family Services is affirmed.
Judgment Affirmed.
 ROGERS, J. concurs.
[1] Kerrie and Kendavid Kessinger, Sr. are the biological parents of minor children Skyyea Kessinger (D.O.B. 6/3/95), age 11, Starr Kessinger (D.O.B. 6/2/00), age 7, Cheyenne Kessinger, age 5, and Kendavid Kessinger, Jr. age 3. However, we note that the two older children are not at issue in the present appeal.
[2] We note that the DCJFS's complaint alleged that all four children were neglected and that Skyyea, Starr and Kendavid, Jr. were also dependent. However, as Skyyea and Starr's cases are not at issue in the present appeal, we will not address the specific pleadings and facts associated with their cases unless otherwise relevant to the present appeal. Additionally, although Cheyenne and Kendavid Jr. each have their own case number, each with its own corresponding filings, for ease of discussion we shall refer to all pleadings and orders of the juvenile court in the singular, unless otherwise noted.
[3] On December 9, 2005 the DCJFS filed an amended case plan changing the placement of Cheyenne and Kendavid Jr. After receiving reports that the children were not being treated fairly and that discipline was inappropriate at the relative's placement, Cheyenne and Kendavid Jr. were removed from that home and placed together in a licensed foster home.
[4] At the March 9, 2006 hearing the juvenile court also addressed the DCJFS's oral motion for emergency custody of Skyyea and Starr based in part upon continual problems with the cleanliness of Appellants' home, Appellants' failure to complete their psychological evaluations and failure to consistently appear for counseling, Appellants' unemployment, and their failure to obtain appropriate and consistent medical intervention for Skyyea's health problems. The juvenile court found that there was no immediate emergency as to the two older children and therefore found it to be in their best interests to remain in the custody of Appellants and under the protective supervision of the DCJFS pending further hearing on the agency's motion which the court scheduled for April 26, 2006.
[5] This motion also requested termination of the DCJFS's protective supervision of Skyyea and Starr.
[6] Filed with the juvenile court on January 5, 2007 in support of the DCJFS's motion for permanent custody, Johnson's affidavit stated that Cheyenne and Kendavid, Jr. had been in the temporary custody of the agency for over 12 months of a consecutive 22 month period. Additionally, while not specifically enumerated as such, Johnson alleged violations of R.C. 2151.414(E)(1) (parents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside their home). Johnson's affidavit also stated that "the parents have demonstrated that they are unable to meet the basic needs and provide proper supervision of young children." Johnson also "represented that visitations with Kendavid Jr. do not go well. He is very young and is quite violent and has nightmares after these visits and hits and kicks his mother during the visits. Furthermore, Cheyenne's psychiatrist recommends that it is not in her best interests to have contact with her parents and she has not had visits with them since March of 2006." Finally, Johnson stated that "[d]ue to the family exhibiting a history of not being able to provide a safe and stable environment for young children it is the Agency's belief that it is in the best interests of the younger two children to be placed in the permanent custody of the agency."
[7] For the purposes of division (B)(1) of R.C. 2151.414, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date that the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty (60) days after the removal of the child from the home. In the instant case, Cheyenne and Kendavid Jr. were adjudicated dependent at a hearing conducted on July 6, 2005. This matter immediately proceeded to disposition on that date and on July 22, 2005 the juvenile court issued a Judgment Entry ordering that the appropriate disposition was for Cheyenne and Kendavid Jr. to be placed in the temporary custody of the DCJFS. Cheyenne and Kendavid Jr. remained in the temporary custody of the DCJFS without interruption as of the date the DCJFS filed its motion for permanent custody on December 29, 2006. Accordingly, the children were in the temporary custody of the DCJFS for at least 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d).
[8] We note that Sharon Shull is the actual owner of the home where Sabrina lives with Cheyenne and Kendavid, Jr. and that Sharon has spent considerable time with the children.
[9] Dr. Mashalker explained reactive attachment disorder as "a syndrome that is seen where there are problems with the maternal attachment and bonding and that syndrome develops if there are inconsistencies in meeting the child's needs. If they are either inconsistently done or if they are not done appropriately or if the boundaries are not appropriately done, then the child can develop this syndrome which includes depressive symptoms, aggressive symptoms, irritability, and symptoms as to boundary problems."