OPINION
{¶ 1} This case involves an expedited appeal from a trial court decision awarding permanent custody of E.H. and S.H. to the Clark County Department of Job and Family Services (CCDJFS). Appellant, Elizabeth Michelle H. (referred to as Michelle), raises the following assignments of error:
 {¶ 2} "I. The trial court erred to Appellant's prejudice when it found that there was clear and convincing evidence that the minor children could not be placed with the Appellant within a reasonable time or should not be placed with the Appellant.
 {¶ 3} "II. The trial court erred to Appellant's prejudice when it found that there was clear and convincing evidence that the children's best interest would be served by a permanent custody award to the agency.
 {¶ 4} "III. The Appellant was deprived of her right to effective assistance of counsel in contravention of the Fifth andFourteenth Amendments of the United States Constitution and Article One Section Ten of the Ohio Constitution."
 {¶ 5} After considering the assignments of error and applicable law, we find that the trial court did not err in awarding permanent custody of E.H. and S.H. to CCDJFS. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 6} The custody hearings in the present case were held before a magistrate, who found that E.H. and S.H. should not be returned to Michelle because she had failed to remedy the conditions that caused the children to be placed outside the home. In particular, the magistrate focused on Michelle's absenteeism from work and lack of sick leave, which would cause her to lose her job if she had to care for an ill child; Michelle's struggle to maintain appropriate housing and need for substantial drug treatment and therapy to maintain herself; the fact that Michelle was not prepared to take the children home and care for them herself; the fact that all requested services were provided, but that Michelle had failed to assimilate the advice and direction given to her; and Michelle's struggle over time to adequately support the children. After reviewing the record, the trial court agreed with the magistrate, overruled Michelle's objections, and adopted the magistrate's decision as the order of the court.
 {¶ 7} Michelle contends that the decision was erroneous because the evidence failed to support the factors the trial court relied on. Specifically, these were factors (1), (2), (4), and (14) in R.C. 2151.414(E), which provides, in pertinent part, that:
 {¶ 8} "[i]n determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 9} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 10} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 of the Revised Code;
 {¶ 11} "* * *
 {¶ 12} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; "* * *
 {¶ 13} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."
 {¶ 14} Notably, R.C. 2151.414(E) requires the court to find only one of the listed factors. Therefore, if clear and convincing evidence supports any of the above factors, the trial court would have been justified in finding that E.H. and S.H. could not be placed with Michelle within a reasonable time, or should not be placed with Michelle.
 {¶ 15} Regarding the first factor, Michelle claims that the children were originally taken from her due to her charge and conviction for assaulting her ex-husband, Scott H. Because she served her time and is no longer being held for the assault, Michelle argues that the condition causing the children's removal has been remedied. However, this was not the only reason why E.H. and S.H. were removed.
 {¶ 16} Michelle is the mother of four children: K. (a daughter, who was fifteen at the time of the custody hearing in February, 2005); C.O. (a son, who was eleven at the time of the hearing); and E.H. and S.H. (male and female twins, who were born on November 12, 2002). K. was not in the agency's custody, but the agency had temporary custody of the other three children. The permanent custody hearing was scheduled for all three children (C.O., E.H., and S.H.), but Michelle testified at the hearing that C.O.'s best interests would be served by a grant of permanent custody to the agency. The trial court, therefore, issued a custody decision only as to E.H. and S.H. Although C.O.'s case is not before us, we will include some factual background about C.O. and K., for historical purposes, and to put the events of the case in context.
 {¶ 17} C.O. was initially placed in respite care in November, 2002, due to threats he had made to kill his mother and his unborn twin siblings. C.O. never returned to Michelle's care after early December, 2002. After various placements, including two psychiatric facilities, C.O. remained with the same foster care family for about a year and a half before the custody hearing.
 {¶ 18} While C.O. was in placement, efforts were made for Michelle to maintain contact with the child. Michelle was reminded on numerous occasions of the need to be at meetings, therapy, and visits, and to follow through, because C.O. needed consistency. C.O. had been diagnosed with bipolar disorder and his diagnosis was severe. If Michelle were late, C.O.'s anxiety would increase and he went into "manic" mode, would start talking very fast, and would not want to visit with anyone. A mental health case manager (Christine Shediak) who worked with Michelle for a two year period, testified that Michelle had problems with consistency throughout the case. Michelle missed more than half of the team meetings for C.O., which were held monthly. She was late for visits and also missed visits. Michelle was more consistent when she was on her medications, but her consistency was very erratic.
 {¶ 19} Between April, 2003, and July, 2004, Michelle's daughter, K., was also out of Michelle's home and was living with the father (Timothy) of one of K's friends. K. was having problems in school, was quite underweight, and had significant dental problems that had not been addressed. Timothy testified that while K. was in his temporary custody, she gained quite a bit of weight, improved her grades in school, and had the dental problems corrected, mostly at his expense. During this time, Michelle exhibited confused or forgetful behavior. She made appointments to see her daughter, and would sometimes not come at all, or would be two or three hours late.
 {¶ 20} As we noted, the twins were born in November, 2002. On November 4, 2003, CCDJFS was notified that Michelle was in jail, after having allegedly stabbed her husband, Scott. Michelle was charged with felonious assault, domestic violence, and aggravated burglary. The next day, CCDJFS filed a complaint for emergency shelter care, claiming that Michelle was unable to meet the children's needs because she was in jail. The complaint also indicated that Michelle was unable to meet her children's needs because of her mental health status. In addition, the complaint stated that the twins' father, Scott, had a history of substance abuse and had failed to complete treatment.
 {¶ 21} Shediak (the case manager who had been working with C.O. and Michelle), testified that Michelle was having erratic behavior a few days before the stabbing incident and was very panicky the night of the stabbing. Michelle told Shediak that she had not been on her medications, and that she could not afford them. After the children were removed, Michelle began seeing a therapist in November, 2003. The therapist initially diagnosed Michelle as having a depressive disorder, and later changed the diagnosis to Cyclothmic Disorder and personality disorder. These disorders involve a lot of impulsive behavior and mood swings that people notice and that are problematic. Ultimately, Michelle was diagnosed as having bipolar disorder.
 {¶ 22} A temporary shelter care order was filed on November 5, 2003, and a guardian ad litem was appointed shortly thereafter. On December 22, 2003, Michelle and Scott agreed to give CCDJFS temporary custody of the children for one year. A case plan was filed on March 23, 2004, with the goal of reunifying the family. Among other things, Michelle was required to attend all scheduled counseling appointments with C.O., as requested by his therapist. She was also required to attend scheduled visitation with all children, to complete a parenting and psychological assessment and follow all recommendations, to complete a mental health assessment and attend all scheduled appointments, to take any prescribed medication, to attend all scheduled team meetings, and to cooperate.
 {¶ 23} Subsequently, on April 19, 2004, the guardian ad litem filed a report, recommending that temporary custody continue with CCDJFS. The guardian noted that Michelle needed to complete the recommendations in the case plan, and be more attentive in caring for and watching the children. The guardian ad litem also commented that Michelle needed to treat each child on an equal basis and not favor the girl twin over the boy. An amended case plan was filed on May 28, 2004, and stated that the placement should be continued, because the parents needed to show more progress regarding case plan services. In addition, the amended plan commented that reunification was not recommended at that time.
 {¶ 24} Scott H. was not C.O.'s father. On August 25, 2004, Scott was also excluded as the father of the twins based on genetic testing. Consequently, Scott was not involved in the case plan after that point. The real father of the twins has never been located.
 {¶ 25} On October 24, 2004, CCDJFS filed a motion for permanent custody, claiming that Michelle had failed continuously and repeatedly to remedy the conditions that caused the children to be placed outside the home. The items that were listed included the fact that Michelle: 1) had failed to adequately use mental health counseling; 2) had shown an inability to provide an adequate home now and in the foreseeable future due to severe and chronic mental illness; 3) had demonstrated a lack of commitment by failing to regularly visit with the children when able to do so: 4) had failed to regularly support the children when able to do so; 5) was unwilling to provide for the children's shelter and basic needs; and 6) had continued to be unstable.
 {¶ 26} The permanent custody hearing was held on February 24 and 25, 2005. A few days before the hearing, the guardian ad litem filed a report, recommending that Children's Services be granted permanent custody. The guardian noted that Michelle had a satisfactory residence, did love the children, and wanted them back. However, she was not capable of caring for the children and had not satisfactorily completed the case plan.
 {¶ 27} At the hearing, CCDJFS presented testimony from social workers, counselors, members of Michelle's family, a family coach, and people who had given foster or temporary care to Michelle's children. C.O.'s therapist and foster family testified about the tremendous and beneficial changes that had occurred since C.O. was removed from Michelle's home. C.O. had gone from urinating in containers in his room, stealing, lying, manipulating, and being physically and verbally violent, to now exhibiting minimal aggressive behaviors. C.O. was in a regular classroom in school and was doing very well. However, he did need a great deal of structure and consistency, which Michelle could not provide. Michelle was inconsistent in attending visitation and meetings, and engaged in behavior that increased C.O.'s anxiety level, even though she had been counseled many times on the importance of not rasing C.O.'s anxiety. The record was replete with evidence of instances in which Michelle failed to consider or appreciate how her actions would affect C.O.'s mental health.
 {¶ 28} The twins were only a year old when they were removed from Michelle's care. By the time of the hearing, the twins had been in custody for more than fifteen months, or more than half their lives. When the twins were removed from Michelle's home, they were very sick. They both had double ear infections and infected eyes. One twin had a bacterial infection and the other had a yeast infection. Since being in foster care, the twins have done well and have been in good health. There have been continuing issues about Michelle's failure to change diapers often enough and failure to provide adequate meals for the children when they visit her. As with C.O., there have been numerous instances where Michelle has shown up late or has missed visitation with the twins. Furthermore, although Michelle was given opportunities for increased visitation with the twins, she did not take advantage, even after being told that more in-home visitation was needed before reunification could take place. For example, in December, 2004, Michelle was offered the opportunity to take the twins all day on Mondays and Tuesdays, which were her days off. However, Michelle did not want to take the children and gave no explanation for her refusal.
 {¶ 29} Michelle was also supposed to have Christmas visitation with the twins on December 20 and 21, 2004, but cancelled those visits. She told the caseworker that she had an important appointment on one day, and had to work the other day. However, when the caseworker asked for verification from Michelle's employer (Dole), Michelle admitted that she had cleaned houses on the days she had missed visitation. The caseworker was upset because the visits were only two hours long each day, and Michelle had made no attempt to schedule her housecleaning around the visits. Michelle also did not bring the children any Christmas presents.
 {¶ 30} These are simply a few instances of behavior that is inconsistent with a desire to reunify with the children. The record is filled with such behavior. Even on February 5, 2005, or just a few weeks before the scheduled permanent custody hearing, Michelle cut short a weekend visit with the twins and went out to eat with her boyfriend and parents. That day, she was supposed to have the twins from 8:00 a.m. to 7:00 p.m., but asked CCDJFS to pick the twins up at 1:30 p.m. Michelle told the caseworker that she had to work, but the caseworker found out later that Michelle had gone out to dinner instead.
 {¶ 31} The therapist who saw Michelle between November, 2003, and the fall of 2004, testified that Michelle demonstrated a lot of irresponsibility in her commitment to counseling and seemed unaware of how her actions affected others. A pattern for Michelle was that she did well for a while and then things would fall apart. Michelle had difficulty handling herself when things were difficult, and the therapist did not see much improvement during the time she counseled Michelle. When the therapist closed out the case (due to Michelle's nonpayment), Michelle was still having problems with irresponsibility and with managing the crises that come up in life.
 {¶ 32} Both Michelle's father, Michael, and her sister, Cynthia, testified at the hearing. Michael indicated that Michelle had problems for more than fifteen years with providing a stable home for her children, and with providing the structure and guidance the children needed on an ongoing basis. Michael and his wife had raised Michelle's first daughter, K., in their home for about four and a half years, and Michelle had been in and out of their home before and after that time period, due to problems with relationships and finances. Michael noted that Michelle did love her children, but could not take care of them for a variety of reasons. According to Michael, Michelle was incapable of successfully raising her three younger children (C.O. and the twins) at that point in time.
 {¶ 33} During high school, Michelle came to live with her older sister, Cynthia, due to their mother's mental illness and to problems Michelle was having with anorexia. Cynthia testified that she had tried to be a financial and emotional support during Michelle's adult life. Like Michelle's father, Cynthia felt that Michelle was not capable of caring for C.O. or the twins on a long-term basis. She noted that Michelle had been bombarded with repeated episodes of instability, and had not been able to demonstrate, even with supports in place, that she had the ability to provide consistency for her children. Michelle had not been able to consistently parent her children and provide for their basic needs.
 {¶ 34} Cynthia testified that Michelle has scattered thinking and is not organized. Following through with things is difficult. Michelle has told Cynthia that she has behavior outbursts and emotional swings. Michelle will know that she needs to be somewhere, but she will forget what day or time she is supposed to be there.
 {¶ 35} In the year and a half before the custody hearing, Michelle had seven different residences. At one point, in the fall of 2004, she was homeless for two months and lived at a homeless shelter. This failure to maintain a stable residence significantly affected the visitation schedule. Furthermore, even though Michelle had maintained full-time employment since April, 2004, she did not pay any child support for the children until January, 2005. She had been ordered to pay child support beginning in April, 2004.
 {¶ 36} Finally, Michelle had anger outbursts during team meetings and with service providers, at times using foul language. These outbursts continued throughout the case.
 {¶ 37} In view of the above facts, there was clear and convincing evidence that despite reasonable case planning and diligent efforts by CCDJFS, Michelle failed to remedy the problems that caused the twins to be placed outside her home. R.C. 2151.414(E)(1).
 {¶ 38} Because a positive finding on only one factor in R.C.2151.414(E) is required, we need not discuss the rest of the factors in detail. However, we do note that the above facts also clearly and convincingly support findings: 1) that the twins should not be placed with Michelle due to chronic mental illness that prevents Michelle from being able to provide a permanent home for the twins; 2) that Michelle has demonstrated a lack of commitment to the twins by failing to regularly support or visit them when able to do so, and by other actions showing unwillingness to provide a permanent home for the twins; and 3) that Michelle was unwilling to provide basic necessities to prevent the children from suffering neglect. R.C. 2151.414(E)(2), (4), and (14).
 {¶ 39} The testimony at the custody hearing indicates that Michelle has suffered from chronic mental illness that prevents her from exercising appropriate judgments about the welfare of her children. While she did visit them throughout the course of the case, she frequently missed visitation and declined to exercise or increase visitation in a way that would have allowed the children ultimately to be returned to her home. She also failed to pay any financial support for the children for months after support was ordered, when she had a full-time job. Accordingly, the trial court did not err in finding that the children should not be returned to Michelle. The first assignment of error, therefore, is without merit and is overruled.
 II {¶ 40} In the second assignment of error, Michelle contends that the trial court erred by finding that there was clear and convincing evidence that the children's best interest would be served by a permanent custody award to the agency. Under R.C.2151.414(D), the trial court is required to determine the best interests of the child, by considering:
 {¶ 41} "all relevant factors, including, but not limited to, the following:
 {¶ 42} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 43} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 44} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 45} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 46} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 47} Regarding R.C. 2151.414(D)(1), Michelle points to evidence that she has a "wonderful" relationship with her children. This particular reference is to testimony from Michelle's father, Michael, who was asked if the children should be returned to Michelle. In pertinent part, Michael responded that:
 {¶ 48} "[C.O.] has told me he — he wants to stay where he is. * * * He's — he's got the security, he's got the stability, he's got the kind of guidance that he's needed and I don't want to see him lose it. The twins, I can only speak to what I see. Once a month, for the past couple of years — we've missed a couple of months for a variety of reasons — but generally, we've been able to visit once a month. And it's obvious that the kids know Michelle and Michelle knows — has a wonderful relationship with the kids. But in terms of her being able to provide for them at this point in time, no. Financially, for example, Michelle doesn't have, at least at this point in time, sick leave which provides her paid sick leave. She has sick leave days available to her, but they're not paid. So, last week she said she was sick for a couple of days and so her paycheck was short. Well, preschoolers by nature, they're sick. That's just the way little kids are until they get bigger.
 {¶ 49} "* * *
 {¶ 50} "And so she's going to have a short paycheck every time those kids are sick — sick because mom really needs to be them. Um, and she needs a predictable income. She won't have it at this point in time. That's just one — one of my concerns. And then looking over the years at how * * * [K.] and * * * [C.O.] have not gotten what they needed, the guidance, structure and support that * * * [C.O.] has, I don't see her being able to provide that any better now than she has been, in the future. I don't see it."
 {¶ 51} Viewed in context, the comment that Michelle has relied on does not support a finding that returning the children to Michelle would be in their best interest. No one appeared to dispute the fact that Michelle loved her children. The guardian ad litem specifically noted this fact, but concluded that Michelle was not capable of caring for the children and had not satisfactorily completed the case plan. Michelle's sister also acknowledged Michelle's love for the children, but also stressed that Michelle was not capable of caring for them. As we discussed, the evidence amply supports these conclusions.
 {¶ 52} The children's wishes were not discussed, obviously because of their very young age. Therefore, R.C. 2151.414(D)(2) does not apply. Concerning R.C. 2151.414(D)(3), Michelle does not contest the fact that the children were in temporary care for more than twelve months of a consecutive twenty-two month period. She does contend that she has a "satisfactory" home, as mentioned by the guardian ad litem, and claims that stability is shown because she has lived there for five months. Michelle also says she has a stable job and that there is no clear and convincing evidence that she will lose her home. As a result, Michelle argues that a legally secure placement can be provided for the twins without granting permanent custody to the agency. See R.C.2151.414(D)(4). We disagree.
 {¶ 53} In the first place, Michelle had been in her home only two months at the time of the hearing, not five. The evidence indicated that she had a pattern of unstable living situations, and had lived in seven different places, including a homeless shelter, while the children were in custody. Consequently, residence of a few month's duration is not entitled to much weight. The evidence also indicated that her employment was not that secure. For example, Michelle admitted that she was not allowed to miss any more time for the next four months at Dole. She further admitted that she had been suspended for three days during the week before the hearing.
 {¶ 54} Although the guardian did state that Michelle had a "satisfactory" home, that conclusion was obviously made from the standpoint that the home was clean and adequately sized for the children. No one maintained that Michelle kept a slovenly home; instead, the allegations were that she did not seem to understand the basic necessities that children need — both physical and emotional. As just one example, Michelle failed to provide cribs or beds for the twins at her home, despite the fact that the caseworker had talked to her for months and months about getting beds. At the permanent custody hearing, Michelle maintained that the twins could sleep with her in her king-size bed. That is not a realistic or appropriate arrangement for the children. According to the evidence, the twins have lived more than half their young lives in temporary care. They have flourished in foster care and need a legally secure placement that cannot be provided without a grant of temporary custody to CCDJFS. R.C.2151.414(D)(4). We need not repeat the evidence that we have previously discussed. It is enough to note that Michelle is not capable of providing the emotional and physical stability and consistency the children need, now or in the foreseeable future.
 {¶ 55} "The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact `"a firm belief or conviction as to the facts sought to be established."'" In re A.B., Summit App. No. 22438,2005-Ohio-1273, at ¶ 9 (citations omitted). An appellate court will not reverse a trial court decision on parental rights and custody unless it finds that the decision is unsupported by "sufficient evidence to meet the clear and convincing standard of proof." In re Dylan C. (1997), 121 Ohio App.3d 115, 121,699 N.E.2d 107.
 {¶ 56} After reviewing the evidence, we find that it clearly and convincingly supports the trial court's decision on the best interests of the children. Accordingly, the second assignment of error is without merit and is overruled.
 III {¶ 57} The final assignment of error is based on a claim of ineffective assistance of trial counsel. We have previously held that the standard two-part test for establishing ineffective assistance of counsel applies to permanent custody proceedings.In re T.P., Montgomery App. No. 20604, 2004-Ohio-5835, at ¶ 45. Under this test, Michelle:
 {¶ 58} "must establish that her attorney provided deficient representation and that counsel's deficient performance prejudiced her. * * * In order to establish prejudice, she must show a reasonable probability that but for counsel's deficiencies the result of the proceeding would have been different." Id. (Citations omitted.)
 {¶ 59} As proof of defective representation, Michelle first points to the fact that trial counsel waived opening and closing statements. We do not find that this choice was deficient. The trial was before a magistrate, not a jury, and judges or magistrates can be expected to be familiar with the issues and law. This would be particularly true in cases like the present, where the juvenile court had been dealing with the parties and issues for many months.
 {¶ 60} The second area of alleged deficiency relates to the failure to cross-examine certain witnesses, including case worker, Denise Barnhart, Michelle's sister, Cynthia, parent aide, Nettie Tomblin, and foster parent, Clyde Pack. In this regard, the Ohio Supreme Court has stressed that "the strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment." State v. Otte, 74 Ohio St.3d 555, 565,1996-Ohio-108, 660 N.E.2d 711.
 {¶ 61} After reviewing the record, we find no deficiency in the failure to cross-examine these witnesses. Trial counsel was faced with difficult choices because the evidence against Michelle, even from members of her own family, was very negative. What was positive was brought out during direct examination of the witnesses called by CCDJFS. For instance, several of these witnesses pointed out that Michelle did care about her children and did want to care for them. Unfortunately, she was simply incapable of doing so, because of chronic mental illness, poor insight, and poor judgment.
 {¶ 62} Furthermore, on those occasions when counsel did cross-examine witnesses, the effort either did not result in a positive answer or opened the door to more negative information from the witness. For instance, during cross-examination of C.O.'s therapist, Michelle's counsel asked whether Michelle had been cooperative during the twenty-two sessions she did attend with C.O. The therapist's reply was that Michelle had been cooperative at times and at other times had not been cooperative. This statement did not aid Michelle's case. More importantly, the cross-examination gave counsel for CCDJFS a chance to inquire into a subject that had not been discussed during prior direct examination of the particular witness, i.e., Michelle's physical aggression and volatility during meetings with foster parents and CCDJFS personnel. Given the way in which the cross-examination backfired, counsel may well have decided, as a trial tactic, to limit the potential harm that other witnesses could cause. In claiming that trial counsel should have cross-examined caseworker, Denise Barnhart, Michelle contends that Denise offered perjured testimony and painted a horrible picture of Michelle, causing the trial court to find that Michelle had not substantially complied with the case plan. Again, we disagree. The perjury that is alleged relates to Denise's statement that "intense" therapy had been recommended in Michelle's psychological assessment. Denise did use the word "intense" (which was not listed in the assessment). However, she also said immediately thereafter that she would have to check the psychological assessment to see what the recommendations were.
 {¶ 63} The psychological assessment was performed early in the case, and was based on observations, tests, and interviews that took place between October, 2003, and March, 2004. Among other things, the psychological assessment stated that Michelle had an extremely high score on a clinical scale that is associated with "impulsive and poorly controlled behavior." According to the assessment:
 {¶ 64} "[p]ersons with a high score on this scale can be expected to have experienced repeated and major disruptions in their lives as a result of their actions and choices. * * * There is a poor ability to learn from mistakes, and poor discipline in investing time and energy in efforts that will benefit them only in the long run (e.g., education, hard work at an unrewarding job, therapy). * * * Such an individual likely would require long-term therapy to make substantial changes, but finding the motivation would be quite difficult."
 {¶ 65} At the time of the assessment, Michelle was making progress, and the psychologist stated that Michelle had the capacity to be a good mother, "but fulfillment of this capacity absolutely requires that she continue to address in therapy the emotional problems and harmful impulsive behaviors that have caused turmoil in her own life and some degree of neglect of her children." The psychologist recommended that Michelle continue in individual therapy, continue participating in C.O.'s therapy, and comply with any recommendations of her own therapist. The assessment concluded that "in the event of any serious and sustained recurrence of impulsive, unreliable, or negligent behavior on * * * [Michelle's] part, CCCS will have to consider, in consultation with * * * [the therapists for Michelle and C.O.] at what point such behavior warrants the agency's effort to obtain permanent custody of any or all of the children."
 {¶ 66} Whether or not the word "intense" was used, it is clear from the assessment that significant, long-term effort would be required. Notably, when the assessment was finished in March, 2004, the goal of CCDJFS was to reunify the family. After the assessment, Michelle did well for a time. However, things fell apart again. Michelle stopped going to counseling in the summer of 2004, and went off her medications. She resumed counseling again, but stopped in September, 2004, even though her therapist advised against it. It was also during this time that Michelle became homeless and lived in a homeless shelter for two months. Even before becoming homeless, she had lived at several different places, including the basement of a woman she knew from church. Michelle's therapist indicated that Michelle's problems were not easily fixed, and at the time Michelle left therapy, limited improvement had occurred.
 {¶ 67} Between September, 2004, and March, 2005, Michelle had gone to another counselor only four times. Denise testified that this was not intensive for purposes of compliance with the case plan. Again, regardless of the precise word used, it is apparent that Michelle did not substantially comply with the case plan. The assessment clearly indicates a need for long-term therapy, and the testimony of Michelle's therapist was that Michelle had made limited progress.
 {¶ 68} Accordingly, we see no evidence of "perjury," nor do we find, after reviewing Denise's testimony, that she painted a horrible picture of Michelle. The testimony of numerous CCDJFS witnesses was completely consistent in portraying a woman who did love her children, but was both unable and unwilling to remedy the problems that caused their removal from her home.
 {¶ 69} Another point of contention was trial counsel's failure to object to alleged "expert" testimony from Michelle's sister, Cynthia. Trial counsel also did not cross-examine Cynthia. However, the evidence reveals that Cynthia had significant training and experience in working with psychiatrists and emotionally impaired people. Among other things, Cynthia was an associate superintendent for special education in a school district. She also had a special endorsement in emotionally impaired disability, and had been an administrator overseeing two different residential treatment facilities as well as a juvenile facility in which she had children with a whole range of medications. In view of her background and long experience with Michelle, Cynthia had valuable insight. Again, Cynthia testified that Michelle loved her children and wanted more than anything to provide a good home for her children, but was just incapable of providing the stability her children needed. It is hard to imagine what could have been gained by cross-examining this witness. The same is true of the remaining witnesses who were not cross-examined. The best the parent aide could say was that she did not feel as threatened by Michelle in the last six months since Michelle had been taking her medication. And, C.O.'s foster father had little contact with Michelle and primarily talked about C.O.'s progress in the foster home.
 {¶ 70} Finally, Michelle contends that trial counsel performed deficiently by stipulating to the guardian ad litem's report. Again, this was a matter of trial tactics. The guardian ad litem did say a few positive things, in that Michelle had a satisfactory residence, loved her children, and wanted them home. However, the guardian concluded, after interviewing various witnesses, that permanent custody should be granted to CCDJFS. Most of the listed witnesses testified at trial, and the witnesses were not just those favorable to CCDJFS. The guardian's report also included witnesses who testified on Michelle's behalf.
 {¶ 71} By stipulating to the guardian's report, trial counsel was able to get the positive findings into record, without eliciting details about the negative findings. Under the circumstances, we see no benefit that would have been achieved for Michelle by having the guardian ad litem testify. Again, this was a trial tactic, and we defer to the judgment of trial counsel. We note that even if this could be viewed as error, it would have been completely harmless, due to the overwhelming evidence supporting the trial court's decision.
 {¶ 72} Because trial counsel did not provide deficient representation, the third assignment of error is without merit and is overruled.
 {¶ 73} Based on the preceding discussion, the first, second, and third assignments of error are overruled, and the judgment of the trial court is affirmed.
Fain, J., and Donovan, J., concur.