DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Jacqueline F. ("the mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to two of her minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB").[1] This Court affirms.
 {¶ 2} The mother is the natural mother of two children with the initials J.F., one born February 22, 2002 and the other born February 20, 2003. She also has two older children who are not at issue in this appeal. J.F. and J.F. have been in and out of CSB custody for most of their short lives. CSB first became involved with this family due to concerns that the mother was neglecting and/or not adequately supervising her children and it has opened more than one case with this family. Over the years, CSB has received 49 referrals on this family, most of which were substantiated. The current case stemmed from repeated concerns about a lack of parental care and supervision of the children. Specifically, CSB alleged that the mother had left J.F. and J.F., then six and eighteen months old, in the backyard of their father's home and then called the father to tell him that the children were there.
 {¶ 3} The children were later adjudicated neglected and dependent children. On June 29, 2004, CSB moved for permanent custody of both children. Following an evidentiary hearing, the trial court found that J.F. and J.F. had been in the temporary custody of CSB for more than 12 of the prior consecutive 22 months and that permanent custody was in their best interests. See R.C. 2151.414(B)(1)(d). Consequently, the trial court terminated the mother's parental rights to J.F. and J.F. and placed them in the permanent custody of CSB. The mother appeals and raises one assignment of error.
 ASSIGNMENT OF ERROR
"The trial court abused its discretion in determining that permanent custody was in the best interest of the minor children."
 {¶ 4} The mother challenges the trial court's decision to place her two minor children in the permanent custody of CSB. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 99. The trial court found that the first prong of the test was satisfied because J.F. and J.F. had been in the temporary custody of CSB for at least 12 of the prior 22 months and the mother does not contest that finding. She challenges only the best interest prong of the permanent custody test.
 {¶ 5} Although the mother contends that the trial court "abused its discretion" in finding that permanent custody was in the children's best interests, this Court does not review this finding under an abuse of discretion standard for a trial court has no discretion to make a finding that is not supported by the evidence. This Court reviews a trial court's factual findings to determine whether they were against the manifest weight of the evidence. See In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, at 3.
 {¶ 6} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. Id. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988),38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 7} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4).[2]
 {¶ 8} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.
 {¶ 9} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoptionof Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 10} The evidence demonstrated that, while the children were living with the mother, their needs were not being met. In particular, the older child had significant medical issues that had apparently never been addressed. Because he was born three months premature, he was required to attend regular follow-up visits with the neonatal intensive care unit (NICU) to identify any problems stemming from his premature birth. When he arrived at the home of the foster mother, she discovered that he had not been attending the NICU check-ups and apparently none of his medical problems were being addressed. At eighteen months old, the child was not walking and could barely even crawl and he spoke no words. The foster mother was also concerned that he could not hear. He was later diagnosed with a severe hearing impairment, cerebral palsy, and fetal alcohol syndrome. The mother admitted that she drank alcohol during the first few months of her pregnancy with him.
 {¶ 11} The younger child was also born premature and also seemed to have delays, although much less severe, but he had been too young to undergo testing. While in the care of the foster mother, both boys had been making progress developmentally. The older child had been fitted with a hearing aid and had been attending weekly physical, speech, and occupational therapy. He was also seeing a neurologist and an ear, nose, and throat doctor regularly. He will continue to have ongoing medical needs and it is essential that he regularly attend medical appointments for him to continue to make progress.
 {¶ 12} Due to the severe medical issues of the older J.F., it was essential that his caregiver meet with all of his medical providers to understand the treatment, therapy, and care of his special medical needs. Thus, as part of her case plan, the mother was required to attend medical appointments. The evidence demonstrated, however, that the mother had attended only half of the children's medical appointments. Although the mother attempted to excuse her absences by stressing that the appointments had been set by the foster mother to accommodate her own schedule, the mother claimed to have a pretty flexible work schedule because she usually worked from home. Moreover, the caseworker testified that some of the children's appointments had been rescheduled to accommodate the mother and she still failed to attend.
 {¶ 13} During June of 2004, the mother was to begin having unsupervised weekend visits with the children. Due to an incident that occurred during the very first visit, however, unsupervised visitation was discontinued and CSB lost hope that reunification of this family was possible. The mother had the children Friday night and all day Saturday and was to meet the foster mother Saturday night to return the children to her. Because the foster mother lived a considerable distance away, the two had agreed to meet at a half-way point. No one disputes that they had agreed to meet sometime after 10:00 p.m. because the foster mother's son had a ball game that night and that the foster mother was going to call the mother at approximately 10:00 to tell her where and when they would meet.
 {¶ 14} The two did not meet up as planned, however, because the foster mother was unable to reach the mother by phone either at her residence or on her cell phone. The foster mother became so worried about the whereabouts of the children that she went to the mother's apartment looking for them and called the police when there was no answer at the door. The mother arrived by cab at her apartment complex at approximately 2:30 a.m., where both the foster mother and a police officer were waiting. The mother directed the foster mother to the home of her friend with whom she had left the children. The testimony of the events of that evening demonstrated to the trial court that the mother had once again left her children with an inappropriate caregiver so that she could go out and pursue her own interests.
 {¶ 15} Without detailing all the specifics of their testimony, suffice it to say that the mother and the foster mother gave very different accounts of why they did not meet up as scheduled that night. The trial court reasonably found, however, that the mother's account "completely lacks credibility" and that she had once again demonstrated that she puts her own desires ahead of the needs of her children. For example, two witnesses gave credible testimony to dispute the mother's main excuse for the foster mother's inability to reach her by phone, and her reason for going on an alleged four-hour, problem-filled quest for her cell phone charger, that her cell phone battery had gone dead. Both the foster mother and the police officer who responded to her 911 call testified that they saw the mother talking on her cell phone when she arrived at her apartment complex. The foster mother and the police officer were also in complete agreement that the mother smelled of alcohol and appeared to be intoxicated when she arrived.
 {¶ 16} Furthermore, even if the trial court had believed the mother's account of what had transpired that night, she had admittedly left her children at the home of a friend whom CSB had already told her was an inappropriate caregiver for these children. At the hearing and on appeal, the mother's counsel suggests that this caregiver was deemed inappropriate simply because her prior residence had no running water. The evidence further demonstrated, however, that CSB also considered this woman an inappropriate caregiver because she had a criminal record and herself had an open case with CSB regarding her own children. In fact, while the mother was at the friend's residence with her children, an incident of violence arose between the woman and one of her teenaged sons, necessitating a call to the police and the arrest of the son.
 {¶ 17} After the domestic violence incident was over, the mother left her children at the friend's house and did not return for several hours. It is unclear how long the children might have been left there, and when they would have been returned to the foster mother, if the foster mother had not come looking for them at their apartment and happened to have met up with the mother in the parking lot. Consequently, the evidence of the mother's interaction and interrelationship with her children tends to weigh in favor of permanent custody to CSB.
 {¶ 18} Because the children were only one and two years old at the time of the hearing, the guardian ad litem spoke on their behalf, and indicated that permanent custody was in the best interests of both children. He emphasized that the children apparently had been neglected by the mother for a significant period of time. The guardian emphasized the older child's medical condition and the fact that his diagnosis, and consequently his therapy and treatment, had been delayed because the mother had not taken him to his required NICU medical check-ups. He also stressed that the mother had attended only half of the medical appointments while the children were placed with the foster mother. The guardian indicated that he did not believe that the mother would follow through on her own and get the children to all of their necessary medical appointments.
 {¶ 19} The custodial history of the children has been spent in and out of CSB custody for most of their short lives. CSB has received 49 referrals on this family, involving allegations that she had left her children with inappropriate caregivers, that she failed to return home or to pick up her children when she was expected, and there were also concerns of alcohol usage by the mother. Most of these referrals had been substantiated by the agency. The caseworker testified that the mother had demonstrated a "significant pattern of leaving these children."
 {¶ 20} The mother does not dispute that there was clear and convincing evidence to support the trial court's finding that these children had spent at least 12 of the consecutive 22 months prior to the hearing in CSB temporary custody. During that time, although the mother has attempted to comply with some of the requirements of her case plan by taking parenting classes and attending counseling, she has failed to remedy the real problems that plague her family.
 {¶ 21} She obtained a drug and alcohol assessment and it was recommended that she attend weekly counseling to avoid a relapse. She did not attend any drug and alcohol counseling, however. The mother testified that she did not see a need to attend counseling because she no longer used drugs or alcohol, other than an occasional glass of wine. The mother had admitted that she had an alcohol problem in the past, however, and even that she abused alcohol during the first few months of her pregnancy with the older child, leading to his fetal alcohol syndrome.
 {¶ 22} Moreover, as detailed above, when the children were returned to the mother for an unsupervised overnight visit, she left them with an inappropriate caregiver and apparently went out drinking. Although she had not had the children alone for some time, she chose to give up some of her limited time with them and leave them with someone else to tend to her own needs. As the trial court stressed, that was the real crux of the problem with the mother's ability to parent these children: she repeatedly puts her own needs ahead of those of her children.
 {¶ 23} There was also evidence that these children were in need of a legally secure placement and that there were no suitable relatives willing to take custody of them. Consequently, the trial court reasonably concluded that a legally secure placement could only be achieved by placing the children in the permanent custody of CSB.
 {¶ 24} There was ample evidence before the trial court from which it could reasonably conclude that permanent custody was in the best interests of J.F. and J.F. The assignment of error is overruled.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Whitmore, P.J., Batchelder, J. concur.
[1] Although the trial court's judgment also placed a third child, A.B., in the legal custody of the paternal grandfather, the mother has not challenged that aspect of the judgment and this Court will not address it.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.