OPINION
{¶ 1} Appellants Rachel Robison and Steven Robison Sr. ("Appellants") appeal from the August 31, 2007 Judgment Entry of the Court of Common Pleas of Hancock County, Juvenile Division terminating their parental rights and granting permanent custody of Baby Boy Robison (aka Steven Robison, Jr.) (D.O.B. 4/6/06) to the Hancock County Job and Family Services — Children's Protective Services Unit ("HCJFS").
 {¶ 2} Steven, Jr. was born on April 6, 2006. Immediately after his birth, the HCJFS sought removal of Steven, Jr. from his parents' care based upon his mother's previous extensive history with HCJFS (including the termination of her parental rights to three other children) as well as both parents' domestic violence and mental health issues. On April 6, 2006 the juvenile court issued an Ex-Parte Order removing Steven, Jr. from the custody and care of his parents upon release *Page 3 
from the hospital and placing him in the temporary custody of the HCJFS.[1] On this same date the HCJFS filed a complaint alleging that Steven, Jr. was a dependent child as defined in Ohio Revised Code section 2151.04.
 {¶ 3} On May 18, 2006 the juvenile court conducted an adjudicatory hearing on the merits of the HCJFS's complaint. At this hearing, the Appellants entered an admission to the allegation of dependency and the trial court found Steven, Jr. to be a dependent child as defined in R.C.2151.04. Steven, Jr. remained in the temporary custody of the HCJFS.
 {¶ 4} On June 29, 2006 the juvenile court conducted a dispositional hearing and ordered that Steven, Jr. be placed in the temporary custody of the HCJFS. (See June 30, 2006 Journal Entry). The court also adopted the May 4, 2006 case plan previously filed with the court.
 {¶ 5} On March 2, 2007 the HCJFS filed a motion for permanent custody of Steven, Jr. pursuant to R.C. 2151.414. On August 28 and 29, 2007 the juvenile court conducted a hearing on the motion for permanent custody. In a Journal Entry dated August 31, 2007 the juvenile court found, by clear and convincing evidence, that it was in Steven Jr.'s best interests to grant permanent custody to the HCJFS and that Steven, Jr. could not be placed in his parents' home within a *Page 4 
reasonable time period. Accordingly, the juvenile court terminated Appellants' parental rights and awarded permanent custody of Steven, Jr. to the HCJFS.
 {¶ 6} Appellants now appeal, asserting one assignment of error.
 ASSIGNMENT OF ERROR THE TRIAL COURT ERRED WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT THE AWARD OF PERMANENT CUSTODY TO THE HANCOCK COUNTY JOB FAMILY SERVICES, CHILDRENS' PROTECTIVE SERVICES UNIT WAS WARRANTED.
 {¶ 7} Prior to addressing Appellants' assignment of error, we must first address the nature of this appeal. Our review of a grant of permanent custody begins by noting that "[i]t is well recognized that the right to raise a child is an `essential' and `basic' civil right.In re Franklin, 3rd Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841 citingIn re Hayes (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." In re Hayes, supra, quotingIn re Smith (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45.
 {¶ 8} Additionally, the trial court is vested with broad discretion in determining the allocation of parental rights and responsibilities for the care of minor children. Blacker v. Wilhelm, 6th Dist. No. WD-04-003, 2005-Ohio-317 citing Miller v. Miller (1983), 37 Ohio St.3d 71, 74,523 N.E.2d 846. As a trial court is in the best position to weigh witness credibility and evaluate a child's needs, the standard for reviewing a trial court's grant of permanent custody is *Page 5 
abuse of discretion. In re Rinaldi, 3rd Dist. No. 1-02-74, 2003-Ohio-2562. Therefore, absent an abuse of that discretion, a trial court's decision regarding the allocation of parental rights and responsibilities must be upheld. Masters v. Masters (1994),69 Ohio St.3d 83, 85, 630 N.E.2d 665. An abuse of discretion constitutes more than an error of law or judgment and implies that the trial court acted unreasonably, arbitrarily, or unconscionably. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id. Therefore, it is within these constructs that we must examine Appellants' assignment of error.
 Assignment of Error {¶ 9} In their sole assignment of error, Appellants allege that the juvenile court erred and abused its discretion as the findings made by the court to support its grant of permanent custody of Steven, Jr. to the HCJFS are not consistent with the standard of clear and convincing evidence, and allege that the court's grant of permanent custody to the HCJFS is against the manifest weight of the evidence.
 {¶ 10} Before a juvenile court may terminate parental rights and award permanent custody of a child to a properly moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for *Page 6 
at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C.2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2141.414(D). In re DM., 2005-Ohio-6740 at ¶ 11 citing R.C.2151.414(B)(1)(a) through (d) and (2); see also In re William S. (1996),75 Ohio St.3d 95, 99, 661 N.E.2d 739.
 {¶ 11} Clear and convincing evidence is that which will produce in the trier of fact `a firm belief or conviction as to the facts sought to be established.'" In re A.B. 9th Dist. No. 22437, 2005-Ohio-1273 at¶ 9; see also In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St.469 at paragraph three of the syllabus. An appellate court will not reverse a trial court's decision on parental rights and custody unless it finds that the decision is unsupported by "sufficient evidence to meet the clear and convincing standard of proof." In re Dylan C. (1997),121 Ohio App.3d 115, 121, 699 N.E.2d 107.
 {¶ 12} In analyzing the first prong of the permanent custody test, we note that the trial court must first determine, by clear and convincing evidence, whether any of the subsections of R.C. 2151.414(B)(1) have been met. In the present case, the evidence demonstrated that Steven, Jr. was not abandoned or orphaned. See *Page 7 
R.C. 2151.414(B)(1)(b) and (c). Additionally, it is clear that he had not been in the temporary custody of the HCJFS for at least 12 months of a consecutive 22-month period prior to the HCJFS filing its motion for permanent custody.[2] See R.C. 2151.415(B)(1)(d). Therefore, we shall focus our analysis on Appellants' claim that the HCJFS did not use reasonable efforts to reunify Steven, Jr. with them and that the trial court erred in determining that the child could not be placed with them within a reasonable time or should not be placed with them based on an analysis under R.C. 2151.414.(E). See R.C. 2151.414(B)(1)(a).
 {¶ 13} R.C. 2151.414(E) states, in relevant part, as follows:
 (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: *Page 8 
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 * * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; * * *
 (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child. (Emphasis added).
 {¶ 14} At the August 28 and 29, 2007 permanent custody hearing, the HCJFS presented the testimony of Mark Olthouse ("Olthouse") who testified that he has been Appellants' caseworker since shortly after Steven, Jr. was born. *Page 9 
Olthouse testified that the HCJFS created a case plan which included the following objectives for Appellants: (2) maintain safe and stable housing, (3) obtain psychological evaluations of their parenting abilities and follow all recommendations, (4) follow through on mental health treatment recommendations, (5) obtain additional parenting knowledge and skills, and (6) receive domestic violence services. (See HCJFS Exhibit 9, Case Plan filed May 4, 2006).
 {¶ 15} Olthouse testified regarding the second objective and Appellants' need to maintain safe and stable housing. Olthouse testified that Appellants lived in at least three residences since Steven, Jr. was born, and each time, Appellants failed to notify him "in advance or within three days" of their change in residence as required by the case plan. Olthouse also testified that Appellants moved in with Rachel's father and stepmother shortly before the permanent custody hearing. Olthouse testified that the HCJFS had serious concerns about Rachel's father and stepmother. Specifically, Olthouse testified that the agency was concerned with the father's history of violence, including incarceration and allegations of violence and sexual abuse toward Rachel as well as similar concerns with the stepmother to the extent that other children were not previously placed in her care by the *Page 10 
agency.[3] Based upon these concerns, Olthouse testified that he would not approve the placement of a child at this residence. Thus, Olthouse testified that Appellants did not successfully complete the second objective of the case plan, especially in light of the information regarding Appellants' current residence.
 {¶ 16} Olthouse also testified regarding the third objective and Appellants' need to obtain psychological evaluations and follow all recommendations. Although Olthouse testified that Appellants completed the psychological evaluations, the evaluations recommended medication for Appellants and Appellants failed to follow through with that recommendation and denied the need for medication.[4] Olthouse also testified that Appellants were not participating in any counseling services as recommended by the evaluation. Accordingly, Olthouse testified that Appellants did not successfully complete the third objective of the case plan.
 {¶ 17} We note that the trial court also heard testimony from Dr. David Connell, the psychologist who administered Appellants' psychological evaluations *Page 11 
as required by the case plan. Dr. Connell testified that he evaluated Appellants in August of 2006 and drafted a report with his findings and recommendations based upon these evaluations. (See HCJFS Exhibit 12).
 {¶ 18} Specifically, Dr. Connell testified that he diagnosed Rachel with generalized anxiety disorder, mild mental retardation, and a personality disorder with dependent and antisocial traits. Dr. Connell testified that to treat these disorders, Rachel would need to participate in ongoing counseling services and case management, develop some level of trust with the professionals working with her, and take medication. Dr. Connell testified that even if Rachel were to begin taking medication to treat these disorders and follow through with counseling, she still would not be able to appropriately parent Steven, Jr. Dr. Connell testified that Rachel does not have the capability to independently parent a child and that there is nothing children's services or the court could provide to change that.
 {¶ 19} Dr. Connell also testified that Steven, Sr. suffers from schizoaffective disorder which causes him to suffer intense, unrelenting anxiety or depression and sometimes psychosis and delusional thinking. Dr. Connell testified that to treat this disorder, Steven, Sr. would need to undergo a comprehensive psychiatric evaluation coupled with ongoing treatment by a psychiatrist, therapy, group therapy, vocational services, job training and coaching, as well as medication. Additionally, Dr. Connell testified that at this time, Steven, Sr. was *Page 12 
not capable of adequately parenting Steven, Jr. Although Dr. Connell testified that it may be possible for Steven, Sr. to parent Steven, Jr. independently in six months time (assuming ongoing mental health services and effective treatment of his mental illness) Dr. Connell testified that if Appellants were to remain together, there would be no chance that Steven, Sr. could adequately parent Steven, Jr.[5]
 {¶ 20} Turning our attention to the fourth objective contained in the case plan and Appellants' need to follow through on mental health treatment recommendations, we note that Olthouse testified that Appellants have not successfully completed this objective. Although Olthouse testified that Appellants followed through with a 12-step family life skills group, he testified that there was also a recommendation that Rachel participate in a bi-polar counseling group, but she had not done so.
 {¶ 21} Regarding the fifth objective contained in the case plan and Appellants' need for additional parenting knowledge and skills, Olthouse testified that Appellants were to complete parent education classes through an agency-approved service provider and follow all recommendations. Although Olthouse testified that Appellants completed the "Keys to Caregiving" program, he and Rebecca Shumaker ("Shumaker"), a parent educator with the HCFJS, both testified that Appellants did not complete the parent education classes offered by *Page 13 
the HCJFS and run by Shumaker, nor have they completed any other home based program. Additionally, although Appellants completed the "Keys to Caregiving" program, Olthouse testified that this program did not satisfy the case plan objective as it was not an intensive and therapeutic program such as the program recommended and run by Shumaker.[6]
 {¶ 22} The sixth and final objective set forth in Appellants' case plan required Appellants to complete domestic violence counseling. Olthouse testified that in order for Appellants to complete this objective, they were to contact Open Arms or an agency-approved service provider, receive an assessment for domestic violence services, and follow all recommendations. However, Carrie Rashleigh from Open Arms Domestic Violence Center testified that Appellants never contacted her agency to receive training in domestic violence counseling.
 {¶ 23} Additionally, Olthouse testified that Appellants approached him and requested anger management counseling in place of domestic violence services as they "never agreed to the need for domestic violence services." Olthouse testified that although he did a recommendation for Appellants to do anger management counseling, he testified that he told them "many times" that anger management counseling would not satisfy his concerns with their domestic violence issues nor *Page 14 
would the completion of anger management counseling satisfy the requirements of the case plan objectives.[7] Accordingly, Olthouse testified that Appellants did not successfully complete the sixth objective of the case plan.
 {¶ 24} We note that the trial court also heard testimony from the Appellants. Rachel testified that she previously had her parental rights terminated to three other children. With respect to the case plan, Rachel testified that she did not follow all of the recommendations made by Dr. Connell based upon her psychological evaluation. Additionally, Rachel testified that she did not complete the case plan goal that concerned the need for domestic violence services because she did not think it was necessary. Rachel also testified that she requested anger management counseling instead of domestic violence counseling, but she still did not complete anger management counseling.
 {¶ 25} Steven, Sr. testified that he did not believe that he and Rachel had completed the case plan. Specifically, Steven, Sr. testified that although he completed a psychological evaluation, he did not follow Dr. Connell's recommendations because he did not feel he needed medication. Additionally, Steven, Sr. testified that he did not follow through with treatment recommendations nor did he or Rachel complete domestic violence counseling. *Page 15 
 {¶ 26} After considering the evidence presented at the permanent custody hearing as well as the written recommendation of the Court Appointed Special Advocate ("CASA")/Guardian Ad Litem ("GAL"), the trial court issued a Journal Entry wherein the court concluded that the parents have failed continuously and repeatedly to substantially remedy the conditions which caused the child to originally be placed outside of the child's home and placed in care on April 6, 2006. Thus, the trial court concluded that Steven, Jr. could not be placed into Appellants' home within a reasonable time and should not be placed with Appellants. (See August 31, 2007 Journal Entry, paragraphs 3-7). In support of these conclusions, the trial court considered the factors set forth in R.C.2151.414(E)(1)-(16) and found that several of these factors had been proven by clear and convincing evidence and outlined its findings in relation to the language contained in R.C. 2151.414(E)(1), (E)(2), (E)(4), and (E)(11) based upon the testimony presented at the permanent custody hearing. (See August 31, 2007 Journal Entry, paragraph 5).
 {¶ 27} Based on the foregoing, we find that the record supports the trial court's finding that Steven, Jr. could not be placed with Appellants within a reasonable time or should not be placed with them based upon an analysis of the factors contained in R.C. 2141.414(E) so as to satisfy the first prong of the permanent custody test. Therefore, we find that Appellants' claim that the trial *Page 16 
court erred in determining that Steven, Jr. should not be placed with them is not supported by the record.
 {¶ 28} Turning our attention to the second prong of the permanent custody test, the "best interest of the child" standard, we note that "[t]he best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. As previously stated, clear and convincing evidence is that which will produce in the trier of fact `a firm belief or conviction as to the facts sought to be established.'"In re A.B. 9th Dist. No. 22437, 2005-Ohio-1273 at ¶ 9; see also In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v.Ledford (1954), 161 Ohio St.469 at paragraph three of the syllabus. An appellate court will not reverse a trial court's decision on parental rights and custody unless it finds that the decision is unsupported by "sufficient evidence to meet the clear and convincing standard of proof." In re Dylan C. (1997), 121 Ohio App.3d 115, 121, 699 N.E.2d 107.
 {¶ 29} R.C. 2151.414(D) provides, in relevant part, as follows:
 (D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following: (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; *Page 17 
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. * * *
 (E)(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.
 {¶ 30} At the August 28 and 29, 2007 permanent custody hearing, the trial court heard testimony from various individuals specifically regarding the elements contained in R.C. 2151.414(D).
 {¶ 31} The court heard testimony from Rebecca Shumaker ("Shumaker"), a parent educator with the HCFJS, who testified regarding Steven, Jr.'s interaction and relationship with his parents. Shumaker testified that she began services with Appellants in September of 2006 and testified that she had previously worked with Rachel between 2000 and 2003 (relating to Rachel's other three children who were eventually placed in the permanent custody of the HCJFS). Shumaker testified that she observed Appellants' parenting on numerous occasions and had "a lot of concerns with the baby's safety due to the way that [Appellants] both would hold *Page 18 
the baby and interact with him." Specifically, Shumaker testified that Appellants did not support the baby's neck and head and would hold him too high. Shumaker also testified that she often intervened in the visitation sessions and when she did so, Appellants did not want to be told to make any changes and would frequently argue about the suggestions she made. Shumaker testified that it was a constant struggle giving Appellants the parent education information. Additionally, Shumaker testified that there was never a time she felt it would be appropriate to recommend that Appellants could take the child in an unsupervised status as they had not made any progress and were resistant to the information provided to them.
 {¶ 32} Shumaker testified that although Appellants fired her as their parent educator in January 2007, she did not close her case and continued to frequently observe the visitations. Shumaker testified that after observing a visitation on May 10, 2007, she still did not believe there had been any change in Appellants' parenting from the last time she had observed them and that there were still many inconsistencies in their parenting. Shumaker testified that her main concerns, if Steven, Jr. was returned to his parents' care, were Steven, Sr.'s unrealistic expectations of a child and Rachel's lack of parenting skills necessary to take care of a baby full time. Accordingly, Shumaker testified that, in her opinion, Appellants would not be able to adequately parent a child in the home and that there was nothing else she could offer Appellants that would change her opinion. *Page 19 
 {¶ 33} Olthouse also testified regarding the factors set forth in R.C.2151.414(D). Olthouse testified that Steven, Jr. was placed in the temporary custody of the HCJFS at birth and remained in the temporary custody of the HCJFS from the time of his removal through the date of the permanent custody hearing. Additionally, Olthouse testified that Rachel's parental rights were previously involuntarily terminated as to three other children.[8] Olthouse testified that Rachel's history is part of the reason the HCJFS sought removal of Steven, Jr. in the present case.
 {¶ 34} Regarding Steven, Jr.'s relationship with Appellants, Olthouse testified that their relationship is cordial and that Steven, Jr. relates to Appellants as he would to another adult he sees regularly; that is, he recognizes them at the visits and reacts appropriately. However, Olthouse testified that Appellants' relationship with Steven, Jr. is confused with control issues. Olthouse testified that Appellants were not able to provide an adequate, permanent home for Steven, Jr., would not be able to do so in the future, that an additional six months [of temporary custody] would not change anything, and that the HCJFS had done everything possible to provide a sustained and substantial change in Appellants' parenting attitudes and abilities. *Page 20 
 {¶ 35} Olthouse testified that Steven, Jr. was in need of a legally secure and permanent placement and that there was no way to achieve this secure and permanent placement without granting permanent custody to the HCJFS. Olthouse testified that it would be in Steven Jr.'s best interests to be placed in the permanent custody of the HCJFS so that he could be adopted.[9]
 {¶ 36} Additionally, Steven Jr.'s CASA/GAL also filed a written report and recommendation regarding the HCJFS's motion for permanent custody. In this report, the CASA/GAL noted that Steven, Jr. was too young to express his wishes. The CASA/GAL recommended that permanent custody of Steven, Jr. be granted to the HCJFS as Appellants "have not shown that they are capable of caring for a child and his needs either now or in the future" and that they have "no support system to aid in the care of Steven, Jr." Accordingly, the CASA/GAL recommended that Steven, Jr. remain in the care of his foster-to-adopt parents until he can be adopted as this placement will "ensure a stable environment where he will be safe and free from physical and emotional harm where he can grow and thrive in a healthy manner." (See August 16, 2007 Report of the GAL).
 {¶ 37} After considering the testimony and evidence presented at the August 28 and 29, 2007 permanent custody hearing, as well as the report of the *Page 21 
CASA/GAL, the trial court concluded as follows:
 As a result of the above-mentioned hearing for Permanent Custody and after considering all evidence presented, exhibits properly admitted into evidence, statements of counsel, closing summary and a written report submitted by the Court Appointed Special Advocate (CASA Exhibit 1) the Court finds by clear and convincing evidence as follows: * * *
 The Court finds by clear and convincing evidence that it would [be] in the best interest of the child to grant his permanent custody to CPSU . . .
 In determining the best interest of the child, the Court has considered all relevant factors included in Section 2151.414(D)(1) through (5) and Section 2151.414(E)(7) through (11) of the Revised Code, the Court has considered the relationship of the child with his parents, relatives, foster parents, out-of-home providers and other people who may significantly affect the child's need for legally secure permanent placement and the probability that this type of placement can be achieved only through the granting of permanent custody to the HCJFS: CPU. The Court further has considered the custodial history of the child along with the wishes of the child as expressed personally to the Court by way of recommendation from their CASA.
(See August 31, 2007 Journal Entry, paragraphs 3 and 4).
 {¶ 38} Based on the foregoing, we find that the record supports the trial court's finding that the grant of permanent custody of Steven, Jr. to the HCJFS would be in the best interests of the child based upon an analysis of the factors contained in R.C. 2151.414(D) so as to satisfy the second prong of the permanent custody test. *Page 22 
 {¶ 39} Thus, we find that the trial court carefully considered all of the evidence presented and engaged in a thorough analysis of both prongs of the permanent custody test as set forth in R.C. 2151.414. Accordingly, we find that the trial court's termination of Appellants' parental rights and grant of permanent custody of Steven, Jr. to the HCJFS was supported by clear and convincing evidence, and therefore was not against the manifest weight of the evidence. Appellants' sole assignment of error is overruled.
 {¶ 40} Therefore, the August 31, 2007 Journal Entry of the Court of Common Pleas of Hancock County, Juvenile Division, terminating Appellants' parental rights and granting permanent custody of Steven, Jr. to the Hancock County Job and Family Services — Children's Protective Services Unit is affirmed.
Judgment affirmed.
 WILLAMOWSKI and ROGERS, JJ., concur.
[1] Upon his release from the hospital Steven, Jr. was immediately placed in a foster home. In a Journal Entry dated April 10, 2007 the juvenile court ordered that Steven, Jr. was to remain in the temporary emergency custody of the HCJFS.
[2] For purposes of division (B)(1) of R.C. 2151.414, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to R.C. 2151.28 or the date that is 60 days after the removal of the child from the home. In the instant case, Steven, Jr. was removed from the home immediately after his birth on April 6, 2006, was adjudicated dependent on May 18, 2004, and remained in the temporary custody of the HCJFS. A dispositional hearing was held on June 29, 2006 and on June 30, 2006 the juvenile court issued a Journal Entry ordering that Steven, Jr. was to be placed in the temporary custody of the HCJFS. He remained in the temporary custody of the HCJFS without interruption as of the date the agency filed its motion for permanent custody on March 2, 2007. However, this time period was not enough to meet the requirements of R.C.2151.414(B)(1) as Steven, Jr. was not in the temporary custody of the agency for at least 12 months of a consecutive 22-month period prior to the HCJFS filing its motion for permanent custody.
[3] Additionally, Olthouse testified that Rachel had assured him that there was no prior involvement between the HCJFS and her father Dunne. However, after completing a background check and speaking with his supervisor, Olthouse found Rachel's statements to be untrue.
[4] However, Olthouse testified that he spoke with Rachel the night before the permanent custody hearing and she stated that she began taking Prozac and Wellbutrin. Olthouse testified that he was unable to confirm that Rachel was currently, in fact, taking her medication.
[5] We note that both Rachel and Steven, Sr. testified regarding their intentions to stay together and stay married.
[6] Shumaker also testified that "Keys to Caregiving" is a very general program that does not address specific parenting concerns and does not focus on at-risk families, such as those families needing extra education and extra hands-on experience.
[7] Olthouse also testified that the case plan has never been amended to replace domestic violence services with anger management counseling.
[8] See also HCJFS's Exhibit 4 (Judgment Entry dated December 5, 2001 terminating Rachel's parental rights to I. Sorg (D.O.B. 6/15/00) and J. Sorg (D.O.B. 6/15/00) and placing the children in the permanent custody of the HCJFS) and Exhibit 5 (Judgment Entry dated January 28, 2004 terminating Rachel's parental rights to J. Sorg (D.O.B. 3/9/03) and placing the children in the permanent custody of the HCJFS.
[9] Olthouse testified that Steven, Jr. is currently placed in a foster-to-adopt home with foster parents he has adapted appropriately to. Olthouse testified that these foster parents have been approved for adoption, have previously adopted children through the HCJFS, and have indicated their willingness to adopt Steven, Jr. *Page 1